# EXHIBIT 1

E-FILED; Baltimore City Circuit Court
Docket: 4/23/2025 5:37 PM; Submission: 4/23/2025 5:37 PM
Envelope: 20917533

DEMOCRACY CAPITAL CORPORATION    *    IN THE
4800 Montgomery Lane, 10th Floor
Bethesda, Maryland 20814    *    CIRCUIT COURT

    Plaintiff,    *    FOR

v.    *    BALTIMORE CITY

ROBERT F. MCDERMOTT, JR.    *    Case No. C-24-CV-25-003179
4455 South Holly Street    _____
Cherry Hills Village, Colorado 80111    *

And    *

MCDJR-TESSE, LLC    *
7 St. Paul Street
Baltimore, Maryland 21202    *

And    *

PETER MCDERMOTT    *
1 Pond Drive
Englewood, Colorado 80113    *

And    *

PMCDTESSE, LLC    *
7 St. Paul Street
Baltimore, Maryland 21202    *

    Defendants.    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT

    Plaintiff, Democracy Capital Corporation, by its undersigned attorneys, hereby sues Defendants, Robert J. McDermott, Jr., MCDJR-TESSE, LLC, Peter McDermott, and PMCDTESSE, LLC, and for its causes of action states as follows:

### Nature of Action

    1.    This lawsuit concerns loans and other credit accommodations the Plaintiff and the Defendants each extended to Tessemae's LLC ("**Tessemae's**"), a Maryland limited liability

company that was engaged in the business of selling salad dressing, marinades, condiments, salad kits and grab to-go food items.

2.      The Defendants contractually agreed with the Plaintiff and Tessemae's to subordinate the loans and credit accommodations they extended to Tessemae's to the loans and credit accommodations Democracy extended to Tessemae's.

3.      The Defendants breached their contractual obligations to Democracy, and engaged in other tortious conduct by, among other things, accepting payments from Tessemae's they were not permitted to accept, modifying the terms of the indebtedness owed to them by Tessemae's without Democracy's knowledge or consent, and extending new credit to Tessemae's that they were not permitted to extend.

4.      Because of the Defendants' improper actions, the Defendants received several million dollars in payments from Tessemae's in connection with their subordinated indebtedness that should have been paid to Democracy as the senior lender.

## Parties

5.      Plaintiff, Democracy Capital Corporation ("**Democracy**" or "**Plaintiff**"), is a Delaware corporation with its principal place of business located at 4800 Montgomery Lane, 10th Floor, Bethesda, Maryland 20814.

6.      Defendant, Robert McDermott, Jr., ("**Robert McDermott**"), is a resident of the State of Colorado who resides at 4455 South Holly Street, Cherry Hills Village, Colorado 80111.

7.      Defendant, MCDJR-TESSE, LLC ("**MCDJR**"), is a Maryland limited liability company with its principal place of business located at 7 St. Paul Street, Baltimore, Maryland 21202. Upon information and belief, MCDJR is a special purpose entity that was formed by Robert

McDermott for the sole purpose of extending loans and credit accommodations to Tessemae's. Upon information and belief, Robert McDermott is the sole member and owner of MCDJR.

8.      Defendant, Peter McDermott, is a resident of the State of Colorado who resides at 1 Pond Drive, Englewood, Colorado 80113.

9.      Defendant, PMCDTESSE, LLC ("**PMCD**"), is a Maryland limited liability company with its principal place of business located at 7 St. Paul Street, Baltimore, Maryland 21202.  Upon information and belief, PMCD is a special purpose entity that was formed by Peter McDermott for the sole purpose of extending loans and credit accommodations to Tessemae's. Upon information and belief, Robert McDermott is the sole member and owner of MCDJR.

### Jurisdiction and Venue

10.     Jurisdiction is proper in this Court pursuant to Sections 6-102 and 6-103 of the Courts and Judicial Proceedings Article of the *Annotated Code of Maryland* because the corporate Defendants are domiciled in, organized under and maintain their principal place of business in the State of Maryland and because the Plaintiff's cause of action against the Defendants is based upon contracts executed in and governed by the laws of the State of Maryland and actions taken by the Defendants in the State of Maryland.

11.     Venue is proper in this Court pursuant to Sections 6-201 and 6-202 of the Courts and Judicial Proceedings Article of the *Annotated Code of Maryland* because the corporate Defendants maintain their principal place of business and/or regularly conduct business in Baltimore City and the individual Defendants are non-residents who can be sued in any county in the State of Maryland.

## Tessemae's

12.    Tessemae's was founded in Maryland in 2009 and grew rapidly. Within a few years, its products were being distributed and sold in supermarkets and large grocery chains throughout the country.

13.    To finance its rapid expansion, Tessemae's obtained loans and equity investments from various sources. However, by early 2018, Tessemae's was experiencing cash flow difficulties and was in default on its obligations to various creditors, many of whom had commenced collection actions against Tessemae's.

14.    Tessemae's defaulted obligations included certain loans Tessemae's had previously obtained from Howard Bank that were secured by a first lien on all Tessemae's assets (collectively, the "**Howard Bank Loans**").

15.    In early 2018, after unsuccessfully attempting to refinance the Howard Bank Loans with another lender, Tessemae's approached Democracy with a proposal that Democracy acquire and restructure the Howard Bank Loans.

## The Democracy Loan

16.    On April 10, 2018, Democracy acquired, restructured and consolidated the Howard Bank Loans into a single loan (the "**Democracy Loan**") that was evidenced by a Consolidated, Amended and Restated Promissory Note in the original principal amount of $3,000,000.00 (the "**Democracy Note**") and various other documents executed and delivered by Tessemae's and others for the benefit of Democracy (together with the Democracy Note, the "**Democracy Loan Documents**").

17.    Under the terms of the Democracy Loan Documents, Tessemae's was required to pay in cash on a monthly basis a portion of the interest accruing on the outstanding principal

4

balance of the Democracy Loan with the balance of the interest deferred at Tessemae's election and payable at maturity together with the entire principal balance and an "exit fee" equal to $7,500,000.00 (the "**Exit Fee**").  In lieu of paying the Exit Fee, Tessemae's could tender to Democracy a "warrant" that would provide for a payment to Democracy in the minimum amount of $7,500,000.00 in the event of a sale, merger, consolidation, reorganization or other capital event of Tessemae's or liquidation of its assets (the "**Warrant**").

18.    In connection with the Democracy Loan, and as an express condition to extending credit, Democracy required that various creditors of Tessemae's subordinate any existing and future indebtedness owed to them by Tessemae's to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan. Those creditors included Defendants, Robert McDermott, MCDJR, Peter McDermott and PMCD.

### The Robert McDermott Subordination Agreement

19.    Pursuant to a Subordination Agreement dated as of April 10, 2018 by and among Robert McDermott, Democracy and Tessemae's (the "**Robert McDermott Subordination Agreement**"), Robert McDermott agreed to subordinate any existing and future indebtedness owed to him by Tessemae's, directly or indirectly, to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan, which was specifically referenced in the Robert McDermott Subordination Agreement.  A true and accurate copy of the Robert McDermott Subordination Agreement is attached hereto as **Exhibit A**.

20.    In the Robert McDermott Subordination Agreement, Robert McDermott represented that he had outstanding loans to Tessemae's in the principal amounts of $200,000.00 and $500,000.00 (collectively, the "**Original Robert McDermott Loans**").  Robert McDermott

agreed that all indebtedness owed to him by Tessemae's, including the indebtedness owed under the Original Robert McDermott Loans (the "**Subordinated Robert McDermott Indebtedness**"), would be subordinate in all respects to the indebtedness owed by Tessemae's to Democracy under the Democracy Loan, and to any other indebtedness owed to Democracy by Tessemae's (the "**Senior Democracy Indebtedness**").

21.     Except for regularly scheduled interest payments approved in advance by Democracy and received at a time when the Democracy Loan was not in default ("**Permitted Payments**"), Robert McDermott was prohibited under the Robert McDermott Subordination Agreement from receiving or retaining any payments with respect to the Subordinated Robert McDermott Indebtedness.

22.      The Robert McDermott Subordination Agreement further provided that, in the event Robert McDermott received or was entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated Robert McDermott Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness.

23.     Robert McDermott was required to hold any prohibited payments that he received with respect to the Subordinated Robert McDermott Indebtedness "in trust" for Democracy's benefit and to promptly deliver the payments to Democracy in precisely the same form in which he received them.

24.     By entering into the Robert McDermott Subordination Agreement, Robert McDermott knowingly and willfully assumed the role of a trustee and fiduciary with respect to any payments that he might receive with respect to the Subordinated Robert McDermott

Indebtedness that he was not permitted to retain under the terms of the Robert McDermott Subordination Agreement.

25.     In connection with his entry into the Robert McDermott Subordination Agreement, the promissory notes evidencing the Original Robert McDermott Loans were amended and restated pursuant to Amended and Restated Promissory Notes each dated April 10, 2018 (collectively, as amended, the "**Original Robert McDermott Loan Notes**").  In the Original Robert McDermott Loan Notes, Robert McDermott expressly acknowledged and agreed that Tessemae's obligations to him under the Original Robert McDermott Loans were subordinate to Tessemae's obligations to Democracy under the Democracy Loan.

26.     In the Robert McDermott Subordination Agreement, Robert McDermott expressly agreed that the Original Robert McDermott Loan Notes would not be modified and that the principal amount of the Subordinated Robert McDermott Indebtedness would not exceed $700,000.00 without Democracy's prior written consent.

### The MCDJR Subordination Agreement

27.     Pursuant to a Subordination Agreement dated as of April 10, 2018 by and among MCDJR, Democracy and Tessemae's (the "**MCDJR Subordination Agreement**"), MCDJR agreed to subordinate any existing and future indebtedness owed to it by Tessemae's, directly or indirectly, to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan, which was specifically referenced in the MCDJR Subordination Agreement. A true and accurate copy of the MCDJR Subordination Agreement is attached hereto as **Exhibit B**.

28.     In the MCDJR Subordination Agreement, MCDJR represented that it had an outstanding loan to Tessemae's in the principal amount of $350,000.00 (the "**Original MCDJR**

**Loan**").  MCDJR agreed that all indebtedness owed to it by Tessemae's, including the indebtedness owed under the Original MCDJR Loan (the "**Subordinated MCDJR Indebtedness**"), would be subordinate in all respects to the Senior Democracy Indebtedness.

29.    Except for Permitted Payments (as defined above), MCDJR was prohibited under the MCDJR Subordination Agreement from receiving or retaining any payments with respect to the Subordinated MCDJR Indebtedness

30.    The MCDJR Subordination Agreement further provided that, in the event MCDJR received or was entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated MCDJR Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness.

31.    MCDJR was required to hold any prohibited payments that it received with respect to the Subordinated MCDJR Indebtedness "in trust" for Democracy's benefit and to promptly deliver the payments to Democracy in precisely the same form in which it received them.

32.    By entering into the MCDJR Subordination Agreement, MCDJR knowingly and willfully assumed the role of a trustee and fiduciary with respect to any payments that it might receive with respect to the Subordinated MCDJR Indebtedness that it was not permitted to retain under the terms of the MCDJR Subordination Agreement.

33.    The Original MCDJR Loan was extended to Tessemae's at the same time and in conjunction with the extension of the Democracy Loan.  The Original MCDJR Loan is evidenced by a Promissory Note dated April 9, 2018 (the "**Original MCDJR Loan Note**").  In the Original MCDJR Loan Note, MCDJR expressly acknowledged and agreed that Tessemae's obligations to

MCDJR under the Original MCDJR Loan were subordinate to Tessemae's obligations to Democracy under the Democracy Loan.

34.    In the MCDJR Subordination Agreement, MCDJR expressly agreed that the Original MCDJR Loan Note would not be modified and that the principal amount of the Subordinated MCDJR Indebtedness would not exceed $350,000.00 without Democracy's prior written consent. MCDJR also agreed to notify Democracy of any default under the Subordinated MCDJR Indebtedness.

### The Peter McDermott Subordination Agreement

35.    Pursuant to a Subordination Agreement dated as of April 10, 2018 by and among Peter McDermott, Democracy and Tessemae's (the "**Peter McDermott Subordination Agreement**"), Peter McDermott agreed to subordinate any existing and future indebtedness owed to him by Tessemae's, directly or indirectly, to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan, which was specifically referenced in the Peter McDermott Subordination Agreement. A true and accurate copy of the Peter McDermott Subordination Agreement is attached hereto as **Exhibit C**.

36.    In the Peter McDermott Subordination Agreement, Peter McDermott represented that he had outstanding loans to Tessemae's in the principal amounts of $250,000.00 and $500,000.00 (collectively, the "**Original Peter McDermott Loans**"). Peter McDermott agreed that all indebtedness owed to him by Tessemae's, including the indebtedness owed under the Original Peter McDermott Loans (the "**Subordinated Peter McDermott Indebtedness**"), would be subordinate in all respects to the Senior Democracy Indebtedness.

37.    Except for Permitted Payments (as defined above), Peter McDermott was prohibited under the Peter McDermott Subordination Agreement from receiving or retaining any payments with respect to the Subordinated Peter McDermott Indebtedness.

38.    The Peter McDermott Subordination Agreement further provided that, in the event Peter McDermott received or was entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated Peter McDermott Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness.

39.    Peter McDermott was required to hold any prohibited payments that it received with respect to the Subordinated Peter McDermott Indebtedness "in trust" for Democracy's benefit and to promptly deliver the payments to Democracy in precisely the same form in which he received them.

40.    By entering into the Peter McDermott Subordination Agreement, Peter McDermott knowingly and willfully assumed the role of a trustee and fiduciary with respect to any payments that he might receive with respect to the Subordinated Peter McDermott Indebtedness that he was not permitted to retain under the terms of the Peter McDermott Subordination Agreement.

41.    In connection with his entry into the Peter McDermott Subordination Agreement, the promissory notes evidencing the Original Peter McDermott Loans were amended and restated pursuant to separate Amended and Restated Promissory Notes, each dated April 10, 2018 (collectively, as amended, the "**Original Peter McDermott Loan Notes**"). In the Original Peter McDermott Loan Notes, Peter McDermott expressly acknowledged and agreed that Tessemae's

obligations to him under the Original Peter McDermott Loans were subordinate to Tessemae's obligations to Democracy under the Democracy Loan.

42.     In the Peter McDermott Subordination Agreement, Peter McDermott expressly agreed that the Original Peter McDermott Loan Notes would not be modified and that the principal amount of the Subordinated Peter McDermott Indebtedness would not exceed $750,000.00 without Democracy's prior written consent.  Peter McDermott also agreed to notify Democracy of any default under the Subordinated Peter McDermott Indebtedness.

**The PMCD Subordination Agreement**

43.     Pursuant to a Subordination Agreement dated as of April 10, 2018 by and among PMCD, Democracy and Tessemae's (the "**PMCD Subordination Agreement**"), PMCD agreed to subordinate any existing and future indebtedness owed to it by Tessemae's, directly or indirectly, to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan, which was specifically referenced in the PMCD Subordination Agreement. A true and accurate copy of the PMCD Subordination Agreement is attached hereto as **Exhibit D**.

44.     In the PMCD Subordination Agreement, PMCD represented that it had an outstanding loan to Tessemae's in the principal amount of $300,000.00 (the "**Original PMCD Loan**").  PMCD agreed that all indebtedness owed to it by Tessemae's, including the indebtedness owed under the Original PMCD Loan (the "**Subordinated PMCD Indebtedness**"), would be subordinate in all respects to the Senior Democracy Indebtedness.

45.     Except for Permitted Payments (as defined above), PMCD was prohibited under the PMCD Subordination Agreement from receiving or retaining any payments with respect to the Subordinated PMCD Indebtedness.

46.     The PMCD Subordination Agreement further provided that, in the event PMCD received or was entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated PMCD Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness.

47.     PMCD was required to hold any prohibited payments that it received with respect to the Subordinated PMCD Indebtedness "in trust" for Democracy's benefit and to promptly deliver the payments to Democracy in precisely the same form in which it received them.

48.     By entering into the PMCD Subordination Agreement, PMCD knowingly and willfully assumed the role of a trustee and fiduciary with respect to any payments that it might receive from Tessemae's with respect to the Subordinated PMCD Indebtedness that it was not permitted to retain under the terms of the PMCD Subordination Agreement.

49.     The PMCD Loan was extended to Tessemae's at the same time and in conjunction with the extension of the Democracy Loan.  The PMCD Loan is evidenced by a Promissory Note dated April 10, 2018 (the "**Original PMCD Loan Note**").  In the PMCD Loan Note, PMCD expressly acknowledged and agreed that Tessemae's obligations to PMCD under the Original PMCD Loan were subordinate to Tessemae's obligations to Democracy under the Democracy Loan.

50.     In the PMCD Subordination Agreement, PMCD expressly agreed that the Original PMCD Loan Note would not be modified and that the principal amount of the Subordinated PMCD Indebtedness would not exceed $300,000.00 without Democracy's prior written consent.  PMCD also agreed to notify Democracy of any default under the Subordinated PMCD Indebtedness.

**Tessemae's Default on the Democracy Loan**

51.    From the inception of the Democracy Loan, Tessemae's failed to tender to Democracy the full amount of the monthly interest payments that it was required to make under the terms of the Democracy Loan Documents. In addition, Tessemae's failed to provide Democracy with various financial information that it was required to provide to Democracy.

52.    Due to Tessemae's various defaults under the Democracy Loan Documents, Democracy invoked its right to assess default interest on the Democracy Loan commencing on July 1, 2019.

53.    On February 21, 2020, Democracy accelerated and demanded payments in full of the Democracy Loan.

54.    The Democracy Loan matured by its terms on April 10, 2020.

55.    Tessemae's failed to repay the Democracy Loan or satisfy its related obligations to Democracy, including payment of the Exit Fee or tender of a conforming Warrant.

56.    On November 11, 2020, Democracy filed suit against Tessemae's and certain guarantors of the Democracy Loan, Gregory and Genevieve Vetters (collectively, the "**Vetters**"), in the Circuit Court for Baltimore County, Case C-03-CV-20-004048 (the "**Baltimore County Case**"), to collect the sums that were then owed to Democracy under the Democracy Loan.

57.    After protracted litigation in the Baltimore County Case, Democracy obtained a final judgment against Tessemae's and the Vetters on January 25, 2024, in the principal amount of $8,706,250.00 (the "**Baltimore County Judgment**").

58.    On February 1, 2023, Tessemae's filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland, Case No. 23-10675 (the "**Bankruptcy Case**").

59.    Democracy filed a claim in the Bankruptcy Case for the sums owed to it in connection with the Democracy Loan.

60.    After protracted litigation, the Bankruptcy Case was resolved in the Summer of 2024 by approval of a plan of reorganization (the "**Approved Bankruptcy Plan**") that, among other things, granted Democracy an allowed claim against Tessemae's in the amount of $16,233,760.77 (the "**Allowed Bankruptcy Claim**").

61.    Although Democracy has received certain payments from Tessemae's and the Vetters in connection with their obligations to Democracy under the Baltimore County Judgment, the Approved Bankruptcy Plan and the Allowed Bankruptcy Claim, a substantial portion of the indebtedness owed to Democracy in connection with the Democracy Loan remains outstanding and unpaid.  As of the date of this Complaint, the amount of that unpaid indebtedness exceeds $10,000,000.00.

**Improper McDermott Pre-Bankruptcy Loans, Loan Modifications and Loan Payments**

62.    Democracy has recently learned that, between 2019 and 2022, the Defendants breached their obligations under their respective Subordination Agreements (collectively, the "**McDermott Subordination Agreements**") by, among other things, accepting payments from Tessemae's with respect to the Subordinated Indebtedness as defined in the McDermott Subordination Agreements (the "**Subordinated McDermott Indebtedness**"), modifying the terms of the Subordinated McDermott Indebtedness without Democracy's knowledge or consent, extending new loans and credit accommodations to Tessemae's that they were not permitted to extend, and failing to notify Democracy of various defaults by Tessemae's under the Subordinated McDermott Indebtedness.

14

63.     On or about July 31, 2019, MCDJR extended a new loan to Tessemae's in the principal amount of $110,000.00 (the "**2019 MCDJR Loan**").  The MCDJR Loan was evidenced by a Promissory Note dated July 31, 2019 executed by Tessemae's for the benefit of MCDJR (the "**2019 MCDJR Loan Note**").  Tessemae's was required under the 2019 MCDJR Loan Note to make monthly payments of interest to MCDJR at the rate of 13.5 percent per annum. Although the 2019 MCDJR Loan was made in the name of MCDJR, the loan proceeds were advanced to Tessemae's by Robert McDermott and all payments that Tessemae's made under the 2019 MCDJR Loan Note were made to and personally received by Robert McDermott, not MCDJR.

64.     On or about July 31, 2019, PMCD extended a new loan to Tessemae's in the principal amount of $110,000.00 (the "**2019 PMCD Loan**").  The New PMCD Loan was evidenced by a Promissory Note dated July 31, 2019 executed by Tessemae's for the benefit of PMCD (the "**2019 PMCD Loan Note**").  Tessemae's was required under the 2019 PMCD Loan Note to make monthly payments of interest to PMCD at the rate of 13.5 percent per annum. Although the 2019 PMCD Loan was made in the name of PMCD, the loan proceeds were advanced to Tessemae's by Peter McDermott and all payments that Tessemae's made under the 2019 PMCD Loan Note were made to and personally received by Peter McDermott, not PMCD.

65.     The 2019 MCDJR Loan and the 2019 PMCD Loan were made without Democracy's knowledge or consent, materially increased the amount of the Subordinated McDermott Indebtedness, and constituted a material breach by the Defendants of their obligations under the McDermott Subordination Agreements.

66.     The McDermott Subordinated Lenders extended additional unauthorized loans and credit accommodation to Tessemae's in 2021 and 2022 in further breach of their obligations to Democracy under the McDermott Subordination Agreements.

67.     On April 18, 2021, the Original Robert McDermott Loans and the Original Peter McDermott Loans matured by their terms.  Tessemae's was unable to repay the loans as agreed. Consequently, Robert McDermott and Peter McDermott, without Democracy's knowledge or consent, caused Tessemae's to execute new Promissory Notes that modified and amended the terms of the Original Robert McDermott Loans and the Original Peter McDermott Loans (collectively, the "**2021 Original Loan Modifications**"). They then began to improperly accept and retain monthly interest payments on the improperly modified loans in violation of their obligations under the McDermott Subordination Agreements.

68.     The Original MCDJR Loan and the Original PMCD Loan also matured by their terms on April 18, 2021.  Tessemae's failed to repay the loans at maturity.  MCDJR and PMCD failed to advise Democracy of Tessemae's default as required under the McDermott Subordination Agreements.  Notwithstanding the maturity of the loans, MCDJR and PMCD continued to receive and accept interest payments on the matured loans in violation of the McDermott Subordination Agreements

69.     In May of 2021, Robert McDermott advanced $500,000.00 to Tessemae's and Peter McDermott advanced $1,000,000.00 to Tessemae's on a temporary basis (collectively, the "**Temporary Advances**").  The Temporary Advances were repaid in full by Tessemae's several days after they were received.  Although short-term, the Temporary Advances constituted Subordinated McDermott Indebtedness under the McDermott Subordination Agreements.  Both the Temporary Advances and the subsequent repayments were made without Democracy's knowledge or consent and violated the McDermott Subordination Agreements.

70.     On June 18, 2021, Robert McDermott made a new loan to Tessemae's in the principal amount of $500,000.00 (the "**2021 Robert McDermott Loan**").  On that same day, Peter

McDermott made a new loan to Tessemae's in the principal amount of $3,000,000.00 (the "**2021 Peter McDermott Loan**").  Both loans were made without Democracy's knowledge or consent, materially increased the amount of the Subordinated McDermott Indebtedness, and constituted a material breach by the Defendants of their obligations under the McDermott Subordination Agreements.

71.     A portion of the proceeds of the 2021 Robert McDermot Loan and the 2021 Peter McDermott Loan were used by Tessemae's to improperly repay loans that two other creditors who had signed subordination agreements with Democracy previously made to Tessemae's. Upon information and belief, both Robert McDermott and Peter McDermott were aware of Tessemae's intention to use the proceeds of the 2021 Robert McDermott Loan and the 2021 Peter McDermott Loan for a purpose that violated Democracy's contractual rights under the subordination agreements executed by the other creditors.

72.     In September of 2022, the Defendants improperly modified and amended the long-matured Original MCDJR Loan and the Original PMCD Loan (collectively, the "**2022 Original Loan Modifications**").  The principal amount of the Original MCDJR Note was increased from $350,000 to $1,804,454.00 and the principal amount of the Original PMCD Note was increased from $350,000 to $1,804,454.00.  The 2022 Original Loan Modifications were made without Democracy's knowledge or consent, materially increased the amount of the Subordinated McDermott Indebtedness, and constituted a clear breach by the Defendants of their obligations under the McDermott Subordination Agreements.

73.     In all, between August of 2019 and September of 2022, the Defendants collectively received and improperly retained more than $800,000.00 in prohibited interest payments and other income (collectively, the "**Improper Pre-Bankruptcy Payments**") in connection with

Subordinated McDermott Indebtedness, including the unauthorized new loans and loan modifications.

74.     The Improper Pre-Bankruptcy Payments included interest payments that were not "Permitted Payments" under the McDermott Subordination Agreements, were received and retained by the Defendants at a time when they were in default of their obligations under the McDermott Subordination Agreements, and/or had been notified or had actual knowledge that the Senior Democracy Indebtedness was in default and had not yet been repaid in full.

75.     Despite their fiduciary obligations to Democracy under the McDermott Subordination Agreements, the Defendants failed to hold in trust and remit to Democracy the Improper Pre-Bankruptcy Payments they received from Tessemae's and actively concealed from Democracy the fact they had received and retained the Improper Pre-Bankruptcy payments, in breach of their contractual and fiduciary obligations to Democracy.

<u>**Improper Receipt and Retention of Post-Bankruptcy**</u>
<u>**Payments On Pre-Petition Subordinated McDermott Indebtedness**</u>

76.     In or about September of 2024, in connection with Tessemae's Approved Bankruptcy Plan, the Defendants collectively received from Tessemae's bankruptcy estate (and improperly retained) the sum of $200,000.00 (the "**McDermott Bankruptcy Distribution**") in partial repayment of monies owed to MCDJR and PMCD in connection with the Original MCDJR Loan and the Original PMCD Loan.

77.     Under a separate agreement between the Defendants and the Vetters entered into in or about July of 2024, the Vetters, as guarantors of the Democracy Loan, agreed to make periodic payments to the Defendants totaling $550,000.00 in the aggregate (collectively, the "**Vetter Settlement Payments**") in settlement of their personal liability to the Defendants on the

Subordinated McDermott Indebtedness. Upon information and belief, the Defendants have received to date approximately $250,000,00 in Vetter Settlement Payments.

78.    Upon information and belief, the McDermott Bankruptcy Distribution and the Vetter Settlement Payments were paid to and retained personally by Robert McDermott and Peter McDermott, even though the payments were ostensibly being made on indebtedness owed to MCDJR and PMCD.

79.    The McDermott Bankruptcy Distribution and the Vetter Settlement Payments constitute payment of Subordinated McDermott Indebtedness received at a time when the Democracy Loan was in default and unpaid.

80.    Under the terms of the McDermott Subordination Agreements, the Defendants were required to hold McDermott Bankruptcy Distribution and the Vetter Settlement Payments in trust for the benefit of Democracy and to promptly remit the payments to Democracy in the form they were received.

**Improper Receipt and Retention of Payments On Debtor-In-Possession Financing**

81.    In or about February of 2023, in connection with Tessemae's Bankruptcy Case, Robert McDermott and Peter McDermott collectively provided $625,000.00 in debtor-in-possession financing to Tessemae's (the "**DIP Loan**").

82.    Although Robert McDermott and Peter McDermott initially proposed extending the DIP Loan to Tessemae's in the names of their wholly owned entities MCDJR and PMCD, they subsequently incorporated a new special purpose entity, Tesse DIP, LLC ("**Tesse DIP**"), which they designated as the nominal lender on the DIP Loan.

83.    Although the DIP Loan was made in the name of Tessee DIP, all funds used to make the loan were personally provided by Robert McDermott and/or Peter McDermott.

84. The DIP Loan was secured by a junior lien against all of Tessemae's assets. The Bankruptcy Court's Order approving the DIP Loan expressly provided that the lien was subordinate to the lien securing the Democracy Loan.

85. During the Bankruptcy Case, Tessemae's made monthly interest payments totaling approximately $25,000.00 on the DIP Loan. Upon information and belief, these payments were paid directly to Robert McDermott, not Tessee DIP.

86. In connection with the Debtor's Approved Bankruptcy Plan, the sum of $650,000.00 was disbursed to Tessee DIP in repayment of the DIP Loan. Upon information and belief, the $650,000.00 payment, which was disbursed in or about September of 2024, was paid directly to and retained by Robert McDermott, not Tessee DIP.

87. The $675,000.00 in payments that were made from Tessemae's bankruptcy estate in connection with the DIP Loan (collectively, the "**DIP Loan Payments**") were made using the proceeds of assets of Tessemae's in which Democracy had a senior lien.

88. The DIP Loan Payments represent payments on obligations owed directly or indirectly to one or more of the Defendants and therefore constitute Subordinated McDermott Indebtedness as defined in the McDermott Subordination Agreements.

89. Because the DIP Loan Payments were received at a time when the Democracy Loan was in default and unpaid, the Defendants were required under the terms of the McDermott Subordination Agreements to hold the DIP Loan Payments in trust for the benefit of Democracy and to promptly remit the payments to Democracy in the form they were received.

### Democracy Discovers and Demands that the Defendants Surrender the Improper Payments They Received on the Subordinated McDermott Indebtedness.

90. In 2024, in conjunction with and following the implementation of the Debtor's Approved Plan, Democracy received information and records from Tessemae's and other parties

from which it discovered for the first time the various improper payments and other breaches by the Defendants of their obligations under the McDermott Subordination Agreements.

91.    By letter dated November 12, 2024, Democracy demanded that the Defendants remit to Democracy all payments they improperly received and retained in connection with the Subordinated McDermott Indebtedness, including the Improper Pre-Bankruptcy Payments, the McDermott Bankruptcy Distribution, the Vetter Settlement Payments and the DIP Loan Payments.

92.    The Defendants have refused to comply with Democracy's demand or to otherwise satisfy their obligations to Democracy under the McDermott Subordination Agreements.

### COUNT I
### (Breach of Contract – Improper Pre-Bankruptcy Payments)

93.    Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

94.    The McDermott Subordination Agreements constitute valid and binding contractual obligation between Democracy and Defendants.

95.    Pursuant to the McDermott Subordination Agreements, the Defendants contractually agreed, among other things, that:

a.    the Subordinated McDermott Indebtedness would be subordinate in all respects to the Senior Democracy Indebtedness;

b.    with the sole exception of Permitted Payments, the Defendants would not accept or retain any payment with respect to the Subordinated McDermott Indebtedness unless and until the Senior Democracy Indebtedness was paid in full; and

c.    if the Defendants received any payment with respect to the Subordinated McDermott Indebtedness that they were not entitled under the McDermott Subordination Agreements to accept or retain, they would hold the payment "in trust" for the benefit of

Democracy and immediately remit the payment to Democracy for application to the Senior Democracy Indebtedness in precisely the same form it was received by the Defendants.

96.    The Defendants materially and intentionally breached the McDermott Subordination Agreements by, among other things,

a.    Accepting and retaining the Improper Pre-Bankruptcy Payments; and

b.    Failing to hold the Improper Pre-Bankruptcy Payments "in trust" for the benefit of Democracy; and

c.    Failing to immediately remit the Improper Pre-Bankruptcy Payments to Democracy in the same form the payments were received by the Defendants for application to the Senior Democracy Indebtedness.

97.    As a direct and proximate result of the Defendants' breach of their contractual obligations to Democracy under the McDermott Subordination Agreements, Democracy has sustained compensable damages in excess of $800,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A.    Requiring that the Defendants account to Democracy for all Improper Pre-Bankruptcy Payments they accepted and retained with respect to Subordinated McDermott Indebtedness;

B.    Imposing a constructive trust upon the Improper Pre-Bankruptcy Payments and any proceeds thereof the Defendants accepted and retained with respect to Subordinated McDermott Indebtedness;

C.      Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.      Granting Democracy such other relief as may be appropriate.

## COUNT II
### (Conversion -- Improper Pre-Bankruptcy Payments)

98.     Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

99.     The McDermott Subordination Agreements provide that any payment received by the Defendants with respect to the Subordinated McDermott Indebtedness that was not permitted under the McDermott Subordination Agreements constitutes specific and identifiable "property" of Democracy that the Defendants were required to hold "in trust" and to remit to Democracy in precisely the same form in which it was received by the Defendants.

100.    The Defendants received the Improper Pre-Bankruptcy Payments and failed to remit the payments to Democracy as required under the McDermott Subordination Agreements.

101.    The Defendants intentionally accepted and retained the Improper Pre-Bankruptcy Payments without permission or justification in violation of the McDermott Subordination Agreements.

102.    The Defendants deliberately failed to remit the Improper Pre-Bankruptcy Payments to Democracy in the form in which they were received in violation of the McDermott Subordination Agreements.

103.    The Defendants wrongfully exercised dominion and control over the Improper Pre-Bankruptcy Payments in violation of the McDermott Subordination Agreements.

104. Democracy was entitled to actual and immediate possession of the Improper Pre-Bankruptcy Payments.

105. The Defendants' wrongful retention of the Improper Pre-Bankruptcy Payments constituted a tortious conversion of those payments.

106. As a direct and proximate result of the Defendants' conversion of Democracy's property, Democracy has sustained compensable damages in excess of $800,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A. Requiring that the Defendants account to Democracy for all Improper Pre-Bankruptcy Payments they accepted and retained with respect to the Subordinated McDermott Indebtedness;

B. Imposing a constructive trust upon any proceeds of the Improper Pre-Bankruptcy Payments the Defendants accepted and retained with respect to the Subordinated McDermott Indebtedness;

C. Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D. Granting Democracy such other relief as may be appropriate.

## COUNT III
### (Breach of Fiduciary Duty-- Improper Pre-Bankruptcy Payments)

107. Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

108.   Under the McDermott Subordination Agreements, the Defendants were required to hold any payment they received with respect to Subordinated McDermott Indebtedness that they were not permitted under the McDermott Subordination Agreements to accept or retain "in trust" for the benefit of Democracy.

109.   Under the McDermott Subordination Agreements and applicable law, the Defendants acted as trustees with respect to any payment they were required to hold "in trust" for Democracy.

110.   As a trustee with respect to payments they were required to hold "in trust" for Democracy, the Defendants owed Democracy various fiduciary duties, including a duty of loyalty and care.

111.   By entering into the McDermott Subordination Agreements, the Defendants knowingly and intentionally accepted the fiduciary duties imposed upon them in the agreements and under applicable law.

112.   As a fiduciary with respect to the trust funds of Democracy that the Defendants received, McDermott was obligated to, among other things, preserve and protect the trust funds, promptly inform Democracy of its receipt of the trust funds, and promptly remit the trust funds to Democracy in precisely the same form in which they were delivered to the Defendants.

113.   The Defendants breached the fiduciary duties they owed to Democracy under the McDermott Subordination Agreements and applicable law by accepting and retaining for their own use and benefit the Improper Pre-Bankruptcy Payments, failing to hold the payments "in trust" for the benefit of Democracy, failing to promptly inform Democracy of their receipt of the payments, failing to promptly remit the payments to Democracy in the same form in which they

were received as required under the McDermott Subordination Agreements, and actively concealing its actions and omissions from Democracy.

114. As a direct and proximate result of the Defendants' breach of the fiduciary duties they owed to Democracy under the McDermott Subordination Agreements, Democracy has sustained compensable damages in excess of $800,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A.    Requiring that the Defendants account to Democracy for all the Improper Pre-Bankruptcy Payments they accepted and retained with respect to Subordinated McDermott Indebtedness;

B.    Imposing a constructive trust upon any proceeds of the Improper Pre-Bankruptcy Payments the Defendants accepted and retained with respect to Subordinated McDermott Indebtedness;

C.    Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.    Granting Democracy such other relief as may be appropriate.

### COUNT IV
### (Fraudulent Concealment - Improper Pre-Bankruptcy Payments)

115. Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

116. Given the fiduciary obligations imposed upon the Defendants under the McDermott Subordination Agreements and applicable law, the Defendants had a duty to disclose to

Democracy any payment the Defendants received from Tessemae's with respect to Subordinated McDermott Indebtedness that they were not entitled to accept or retain.

117.    The Defendants actively and fraudulently concealed from Democracy the Improper Pre-Bankruptcy Payments.

118.    The Defendants concealed the Improper Pre-Bankruptcy Payments with the specific intention of misleading and deceiving Democracy.

119.    Due to the Defendants' fraudulent concealment of the Improper Pre-Bankruptcy Payments, Democracy was prevented from learning of the payments and was misled and deceived by the Defendants.

120.    As a direct and proximate result of the Defendants' fraudulent concealment of the Improper Pre-Bankruptcy Payments, Democracy has sustained compensable damages in excess of $800,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A.    Requiring that the Defendants account to Democracy for all the Improper Pre-Bankruptcy Payments they accepted and retained with respect to Subordinated McDermott Indebtedness;

B.    Imposing a constructive trust upon any proceeds of the Improper Pre-Bankruptcy Payments the Defendants accepted and retained with respect to Subordinated McDermott Indebtedness;

C.    Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.     Granting Democracy such other relief as may be appropriate.

## COUNT V
## (Breach of Contract – Improper Post-Bankruptcy Payments)

121.   Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

122.   The McDermott Subordination Agreements constitute valid and binding contractual obligation between Democracy and Defendants.

123.   Pursuant to the McDermott Subordination Agreements, the Defendants contractually agreed, among other things, that:

a.     the Subordinated McDermott Indebtedness would be subordinate in all respects to the Senior Democracy Indebtedness;

b.     with the sole exception of Permitted Payments, the Defendants would not accept or retain any payment with respect to the Subordinated McDermott Indebtedness unless and until the Senior Democracy Indebtedness was paid in full;

c.     in the event the Defendants received or were entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated McDermott Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness; and

d.     if the Defendants received any payment with respect to the Subordinated McDermott Indebtedness that they were not entitled under the McDermott Subordination Agreements to accept or retain, they would hold the payment "in trust" for the benefit of Democracy and immediately remit the payment to Democracy for application to the Senior Democracy Indebtedness in precisely the same form it was received by the Defendants.

28

124.    The Defendants materially and intentionally breached the McDermott Subordination Agreements by, among other things,

a.    Accepting and retaining the McDermott Bankruptcy Distribution, the Vetter Settlement Payments, and the DIP Loan Payments (collectively, the "**Improper Post-Bankruptcy Payments**"); and

b.    Failing to hold the Improper Post-Bankruptcy Payments "in trust" for the benefit of Democracy; and

c.    Failing to immediately remit the Improper Post-Bankruptcy Payments to Democracy in the same form the payments were received by the Defendants for application to the Senior Democracy Indebtedness.

125.    As a direct and proximate result of the Defendants' breach of their contractual obligations to Democracy under the McDermott Subordination Agreements, Democracy has sustained compensable damages in excess of $1,200,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A.    Requiring that the Defendants account to Democracy for all Improper Post-Bankruptcy Payments they accepted and retained with respect to Subordinated McDermott Indebtedness;

B.    Imposing a constructive trust upon the Improper Post-Bankruptcy Payments and any proceeds thereof the Defendants accepted and retained with respect to Subordinated McDermott Indebtedness;

C.     Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.     Granting Democracy such other relief as may be appropriate.


/s/ James T. Heidelbach
James T. Heidelbach (CPF No.: 8512010265)
Keith M. Lusby (CPF No. 1312180188)
GEBHARDT & SMITH LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
Telephone: (410) 752-5830
Facsimile: (443) 957-1904
jheid@gebsmith.com
klusby@gebsmith.com

*Attorneys for Plaintiff, Democracy Capital Corporation*

C-24-CV-25-003179

Case 1:25-cv-01654-BAH    Document 1-1    Filed 05/23/25    Page 32 of 110

**E-FILED; Baltimore City Circuit Court**
**Docket: 4/23/2025 5:37 PM; Submission: 4/23/2025 5:37 PM**
**Envelope: 20917533**

# EXHIBIT A

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT ("Agreement") is made as of April 10, 2018, in favor of **DEMOCRACY CAPITAL CORPORATION** ("Lender"), by **ROBERT E. MCDERMOTT, JR.** ("Subordinating Creditor").

### Recitals

Tessemae's LLC, a Maryland limited liability company ("Borrower"), has applied to Lender for certain credit accommodations, including without limitation a commercial loan in the principal amount of $3,000,000 (collectively, "Senior Loan"). The Senior Loan is intended to be evidenced by a Promissory Note from Borrower to the order of Lender in the principal amount of $3,000,000 ("Senior Note"). As used in this Agreement: (a) the term "Senior Debt" means all present and future indebtedness, liabilities, and obligations of any nature whatsoever of Borrower or any affiliate of, or direct or indirect owner of any interest in, Borrower (collectively with Borrower, "Debtors") to Lender or any affiliate of Lender, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation the Senior Loan, and further including without limitation all principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses owed or incurred in connection with any of the foregoing; and (b) the term "Senior Loan Documents" means collectively any security agreement, mortgage, deed of trust, indemnity deed of trust, collateral pledge agreement, loan agreement, letter of credit application, assignment, promissory note, guaranty, indemnity agreement, or any other instrument or agreement previously, simultaneously, or hereafter executed and delivered by Borrower, any other Debtor or any other person as evidence of, security for, guarantee of, or in connection with, any of the Senior Debt, including without limitation the Senior Note.

Subordinating Creditor has extended certain credit accommodations to Borrower, and has or may hereafter extend additional credit accommodations to Borrower or other Debtors. As used in this Agreement, the term "Subordinated Debt" means all present and future indebtedness, liabilities, claims and obligations of any nature whatsoever of any Debtor to Subordinating Creditor, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation all principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses owed or incurred in connection with any of the foregoing.

Lender has required, as a condition precedent to making the Senior Loan to Borrower, that Subordinating Creditor execute and deliver this Agreement.

### Agreements

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Subordinating Creditor hereby agrees with Lender as follows:

1.    *Payment Subordination*.   Subordinating Creditor hereby subordinates the payment of the Subordinated Debt to the payment of the Senior Debt and to all other indebtedness secured by any or all of the assets of Borrower ("Other Secured Debt"). So long as all or any part of the Senior Debt or all or any part of any Other Secured Debt remains unpaid, Subordinating Creditor shall not, without the prior written consent of Lender and the holders of all Other Secured Debt (collectively, "Other Secured Debt Holders"), ask, demand, sue for, set off, accept or receive any payment of all or any part of the Subordinated Debt. Notwithstanding the foregoing provisions of this Section 1, from the date that is 6 months after receipt by Lender and each Other Secured Debt Holder known to Borrower of an Approved Modification (defined below) to the Subordinated Debt until such time as Subordinating Creditor receives written notice from Lender or any Other Secured Debt Holder that a default has occurred under any of the Senior Loan Documents, the Senior Debt or any Other Secured Debt, Subordinating Creditor may receive regularly scheduled payments of interest only on the Subordinated Debt (but may not receive any principal payments). Subordinating Creditor shall not subordinate, assign, or transfer all or any part of the Subordinated Debt to any other person without the prior written consent of Lender and all Other Secured Debt Holders.

2.    *Lien Subordination*.  Subordinating Creditor hereby subordinates the priority of all liens, pledges, assignments and security interests of any kind securing the Subordinated Debt in favor of all liens, pledges, assignments and security interests of any kind securing the Senior Debt and the Other Secured Debt, regardless of the time or order of attachment, perfection, or recording. Upon request by Lender or any Other Secured Debt Holder, Subordinating Creditor shall execute and deliver to Lender or such Other Secured Debt, and hereby authorizes Lender or such Other Secured Debt to record, such documents as Lender, such Other Secured Debt or their respective counsel shall deem necessary or desirable to confirm such subordination. If Subordinating Creditor fails to execute or deliver any such document immediately upon demand, Lender or such Other Secured Debt Holder, or any of their respective officers or employees on behalf of Lender or such Other Secured Debt Holder, is hereby irrevocably authorized to make the same.

3.    *Notice and Cure Rights*.  Subordinating Creditor shall give Lender and each Other Secured Debt Holder notice of any default under the Subordinated Documents (defined below) and shall promptly deliver to Lender and each Other Secured Debt copies of all other material notices delivered by or to Subordinating Creditor under the Subordinated Documents. Lender and each Other Secured Debt Holder shall have the right, but no obligation whatsoever, to cure any default under the Subordinated Documents at any time. These provisions are intended for the benefit of, and shall benefit, Lender and each Other Secured Debt Holder only and may not be used or interposed as a defense by Borrower or any other Debtor in any proceeding with or against Lender or any Other Secured Debt Holder. Neither Lender nor any Other Secured Debt Holder shall be obligated to exercise its right to cure set forth in this Section 3, but shall have the option to do so in its discretion.

4.    *Distributions, Etc*.  In the event of any distribution, division, or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of the assets of any Debtor or the proceeds thereof to creditors of any Debtor or to any indebtedness, liabilities, and obligations of any Debtor by reason of the liquidation, dissolution, or other winding up of any Debtor or any Debtor's business or in the event of any sale, receivership, insolvency, or bankruptcy proceeding, or assignment for the benefit of creditors, or any proceeding by or against any Debtor for any relief under the *United States Bankruptcy Code* or any other insolvency law or other law relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions, or extensions, any payment or distribution of any kind or character, whether in cash, securities, or with respect to all or any part of the Subordinated Debt, shall be paid or delivered directly to Lender for application to the Senior Debt, whether or not due and in such order, proportion and manner as Lender may elect in its sole discretion. Subordinating Creditor hereby irrevocably authorizes and empowers Lender to demand, sue for, collect, and receive every such payment or distribution and to give acquittance therefor and to file claims, vote, and take such other proceedings in Lender's own name or in the name of Subordinating Creditor or otherwise as Lender may deem necessary or advisable to carry out the provisions of this Agreement. Subordinating Creditor hereby agrees to execute and deliver to Lender such powers of attorney, assignments, endorsements, or other instruments as may be required by Lender in order to enable Lender to enforce any and all claims upon or with respect to the Subordinated Debt and to collect and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect to the Subordinated Debt.

5.    *Receipt of Payments by Subordinating Creditor*.  If any payment or distribution not permitted by this Agreement is received by Subordinating Creditor upon or with respect to all or any part of the Subordinated Debt, Subordinating Creditor shall deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Subordinating Creditor where necessary) for application to the Senior Debt, whether or not due and in such order, proportion and manner as Lender may elect, and, until so delivered, such payment or distribution shall be held in trust by Subordinating Creditor as property of Lender. If Subordinating Creditor fails to make any such endorsement or assignment, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

6.    *No Modification of the Subordinated Debt*.  The form and substance of the documents executed in connection with the Subordinated Debt (collectively, "Subordinated Documents") constitute a material inducement to the making of the Senior Loan and the Other Secured Debt, and Subordinating Creditor agrees that it shall obtain the prior written consent of Lender and each Other Secured Debt Holder to any

2

change, amendment or modification of the Subordinated Documents executed prior to the date hereof and to any new Subordinated Documents after the date hereof; provided, however, that Lender's and the Other Secured Debt Holders' consent shall not be required in connection with a written agreement that modifies the Subordinated Documents to reflect the following terms and contains no other material terms for the benefit of Subordinated Creditor ("Approved Modification"): (a) a reduction in the rate of interest accruing on the outstanding principal balance of the Subordinated Debt to not more than 5.00% *per annum*, with a default rate of not more than 10.00% *per annum*; (b) payments of interest only not more than monthly and no payments required for at least 6 months following the date of execution of such modification agreement; (c) a maturity date of not less than 3 years from the date of execution of such modification agreement; (d) if applicable, a reduction in the outstanding principal balance of the Subordinated Debt to the original principal amount of the Subordinated Debt at the time the Subordinated Debt was originally extended, and any principal amounts over the original principal amount shall be shall be forgiven and forfeited by Subordinated Creditor for no consideration other than as permitted by the following sentence; and (e) all interest that has accrued on the Subordinated Debt (including any payment in kind) through the date of execution of such modification shall be forgiven and forfeited by Subordinated Creditor. Subordinated Creditor shall not be obligated to forego any conversion rights, warrants or other equity rights or interests in connection with the execution of an Approved Modification and nothing in this Agreement shall prohibit Borrower from modifying the terms, or increasing the amount, of any conversion rights, warrants or other equity rights or interests of Subordinating Creditor in connection with, or as a consequence of, any Approved Modification, provided that any such rights or interests that constitute or may constitute "Subordinated Debt" shall be subject to the terms of this Agreement. Subordinating Creditor represents and warrants that, as of the date hereof, the Subordinated Debt consists of certain loans in the aggregate principal amount of $700,000. The principal balance owed on the Subordinated Debt, as amended by an Approved Modification, if applicable, shall never exceed such amount without the prior written consent of Lender and each Other Secured Debt Holder.

7.    *Security for Senior Debt*.  To secure the performance by Subordinating Creditor of the provisions of this Agreement and the payment of the Senior Debt, Subordinating Creditor assigns, pledges, and grants to Lender a security interest in the Subordinated Debt and all proceeds thereof. Upon the request of Lender, Subordinating Creditor shall endorse, assign, and deliver to Lender in a manner acceptable to Lender all notes, instruments, and agreements evidencing, securing, guaranteeing, or made in connection with the Subordinated Debt. If Subordinating Creditor fails to make any such endorsement, assignment, or delivery, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

8.    *Liability of Lender*.  The rights granted to Lender in this Agreement are solely for its protection and nothing herein contained imposes on Lender or any Other Secured Debt Holder any duties with respect to the Subordinated Debt or any property of Subordinating Creditor or any Debtor.

9.    *Consents, Waivers, Etc*.  Lender and each Other Secured Debt Holder, at any time or from time to time and without further consent of or notice to Subordinating Creditor and without in any manner affecting, impairing, lessening, or releasing any of the provisions of this Agreement, may renew, extend, change the manner, time, place, and terms of payment of, sell, exchange, release, substitute, surrender, realize upon, modify, waive, grant indulgences with respect to, and otherwise deal with in any manner: (a) all or any part of the Senior Debt; (b) all or any of the Senior Loan Documents; (c) all or any part of any property at any time securing all or any part of the Senior Debt; and (d) any person at any time primarily or secondarily liable for all or any part of the Senior Debt or any collateral and security therefor. Subordinating Creditor hereby waives demand, presentment for payment, protest, notice of dishonor and of protest with respect to the Subordinated Debt, notice of acceptance of this Agreement by Lender, notice of the making of any of the Senior Debt or any Other Secured Debt, and notice of the occurrence of an event of default under any of the Senior Loan Documents or any document evidencing or securing the Other Secured Debt ("Other Secured Debt Documents").

10.    *Other Secured Debt Holders*.  Subject to the terms of this Section 10, the Other Secured Debt Holders shall be deemed third party beneficiaries of the rights and benefits of Lender under this Agreement. At such time as all Senior Debt is indefeasibly paid in full and all of the provisions of the Senior Loan

4841-0043-3760, v. 1

Documents are no longer in effect, or in the event Lender affirmatively elects in writing not to enforce its rights under Sections 4, 5 and 7 of this Agreement, Other Secured Debt Holders shall be entitled to enforce the terms of Sections 4, 5 and 7 of this Agreement as "Lender" hereunder. In the event that there is more than 1 Other Secured Debt Holder, all Other Secured Debt Holders must agree on any action to be taken by Other Secured Debt Holders hereunder. Notwithstanding anything to the contrary contained herein, no Other Secured Debt Holder shall be entitled to any of the benefits of this Agreement or have any rights under this Agreement until such time as such Other Secured Debt Holder has delivered written notice to Subordinating Creditor and Lender of the extension of the Other Secured Debt held by such Other Secured Debt Holder, together with a written agreement acknowledging and consenting to, and agreeing to be bound by, the terms and provisions of this Agreement and a subordination agreement in form and substance acceptable to Lender subordinating the lien and security interest of any relevant Other Secured Debt Documents to the lien and security interest of the Senior Loan Documents and subordinating payment of such Other Secured Debt to payment of the Senior Debt; and, until such time as all of the Senior Debt is indefeasibly paid in full and all of the provisions of the Senior Loan Documents are no longer in effect, no Other Secured Debt Holder shall have any right to enforce this Agreement or any other rights of such Other Secured Debt Holder under any of the Other Secured Debt Documents without the express written consent of Lender. Further, until such time as all of the Senior Debt is indefeasibly paid in full and all of the provisions of the Senior Loan Documents are no longer in effect, each Other Secured Debt Holder shall be deemed to have unconditionally waived any right to subrogation against Lender and any right to subrogation, reimbursement, and indemnity against any property or other security for any or all of the Senior Debt or under any or all of the Senior Loan Documents. No act or omission of any Other Secured Debt Holder shall affect, impair or lessen any right or remedy of Lender hereunder, under any Senior Loan Document or otherwise. In the event of any conflict between the terms and provisions of this Agreement and the terms of any Other Secured Debt Document, the terms and provisions of this Agreement shall control. In the event of any inconsistencies or ambiguities among the terms and provisions of this Agreement, any of the Senior Loan Documents, any of the Other Secured Debt Documents or any other document, Lender shall determine in good faith how such inconsistency or ambiguity shall be construed, interpreted or resolved, and Lender's election of which interpretation or construction is for Lender's benefit, if made in good faith, shall govern. If consent or approval of any Other Secured Debt Holder is required hereunder or otherwise required for any action proposed by Borrower, then Lender, in Lender's sole discretion, shall have the right to grant or withhold such consent or approval on behalf of such Other Secured Debt Holder after the occurrence of a default on the Senior Debt.

11.     *Notices and Communications*. All notices, demands, requests and other communications required under this Agreement shall be in writing and shall be deemed to have been properly given if sent by hand delivery, Federal Express (or similar overnight courier service), or by United States certified mail (return receipt requested), postage prepaid, addressed to the party for whom it is intended at its address hereinafter set forth:

| If to Subordinating Creditor: | Robert F. McDermott, Jr.<br>4455 South Holly Street<br>Cherry Hills Village, Colorado 80111 |
|---|---|
| If to Lender: | Democracy Capital Corporation<br>4800 Montgomery Lane, 10th Floor<br>Bethesda, Maryland 20814 |

With copies to:

Brian C. Rosenberg
Rosenberg Pelino LLC
6031 University Boulevard, Suite 300
Ellicott City, Maryland 21043

Notice shall be deemed given as of the date of hand delivery, as of the date specified for delivery if by overnight courier service or as of 2 days after the date of mailing, as the case may be. Each Other Secured

4

Debt Holder shall notify Lender and Subordinating Creditor of its address for notices and all notices hereunder to Lender shall be delivered to each Other Secured Debt Holder.

12.     *Lender's Successors and Assigns*.  If any of the Senior Debt or any Other Secured Debt is transferred or assigned by the holder thereof, this Agreement shall inure to the benefit of such holder's respective transferees or assignees to the extent of such transfer or assignment, provided that Lender or any such Other Secured Debt Holder shall continue to have the unimpaired right to enforce this Agreement as to any of the Senior Debt or Other Secured Debt not so transferred or assigned.

13.     *No Waiver*.  This Agreement shall not be affected, impaired, or released by the delay or failure of Lender or any Other Secured Debt Holder to exercise any of its rights and remedies against any Debtor or under any of the Senior Loan Documents or any of the Other Secured Debt Documents or against any collateral or security for the Senior Debt or the Other Secured Debt. No delay or failure on the part of Lender or any Other Secured Debt Holder to exercise any of its rights or remedies hereunder or now or hereafter existing at law or in equity or by statute or otherwise, or any partial or single exercise thereof, shall constitute a waiver thereof. All such rights and remedies are cumulative and may be exercised singly or concurrently and the exercise of any one or more of them will not be a waiver of any other. No waiver of any of its rights and remedies hereunder and no modification or amendment of this Agreement shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights and remedies of Lender hereunder in any other respect at any other time. No waiver of any of its rights and remedies hereunder and no modification or amendment of this Agreement shall be deemed to be made by any Other Secured Debt Holder unless the same shall be in writing, duly signed on behalf of such Other Secured Debt Holder, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights and remedies of such Other Secured Debt Holder hereunder in any other respect at any other time.

14.     *Participations*.  Lender shall have the right to grant participations in the Senior Debt to others at any time and from time to time, and Lender may divulge to any such participant or potential participant all information, reports, financial statements, and documents obtained in connection with this Agreement, any of the Senior Loan Documents, or otherwise.

15.     *Severability*.  If any term of this Agreement or any obligation thereunder shall be held to be invalid, illegal, or unenforceable, the remainder of this Agreement and any other application of such term shall not be affected thereby.

16.     *Counterparts*.  This Agreement may be executed in duplicate originals or in several counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument, and it shall not be necessary in making proof hereof to produce or account for more than one such duplicate, original, or counterpart.

17.     *Binding Agreement*.  This Agreement shall be binding upon the heirs, personal representatives, successors, and assigns of Subordinating Creditor and shall inure to the benefit of the successors and assigns of Lender.

18.     *Miscellaneous*.  As used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders, as the context may require, and the term "person" shall include an individual, a corporation, an association, a partnership, a limited liability company, a trust, an organization or any other legal entity. The paragraph headings of this Agreement are for convenience only and shall not limit or otherwise affect any of the terms hereof.

19.     *Governing Law*.  This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland and shall be deemed to be executed, delivered, and accepted in the State of Maryland.

5

20.    *JURY TRIAL WAIVER.* LENDER AND SUBORDINATING CREDITOR JOINTLY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH LENDER AND SUBORDINATING CREDITOR MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY SUBORDINATING CREDITOR, AND SUBORDINATING CREDITOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. SUBORDINATING CREDITOR FURTHER REPRESENTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**[SIGNATURE PAGE FOLLOWS]**

6

4841-0043-3760, v. 1

IN WITNESS WHEREOF, Subordinating Creditor has caused this Agreement to be signed, sealed, and delivered on the day and year first written above.

WITNESS/ATTEST:                          **SUBORDINATING CREDITOR:**

Name: Robert F. McDermott, Jr.

Borrower joins in the execution of this Agreement so as to signify Borrower's acceptance of and consent to the provisions of this Agreement.

WITNESS/ATTEST:                          **BORROWER:**

TESSEMAE'S LLC
A Maryland limited liability company

By: _____(SEAL)
    Gregory Vetter
    Manager

**Acknowledgments**

_State_ OF _Co_ , CITY/COUNTY OF _Arapahoe_ . TO WIT:

I HEREBY CERTIFY that on this _2nd_ day of _April_ , 20_18_, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Robert F. McDermott, Jr., known to me or satisfactorily proven to be the person named in the foregoing document and acknowledged that he executed the foregoing document for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____(SEAL)
NOTARY PUBLIC

My Commission Expires:

_11/14/2020_

DALLAS LIVINGSTON
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20164043266
MY COMMISSION EXPIRES 11/14/2020

7

4841-0043-3760, v. 1

IN WITNESS WHEREOF, Subordinating Creditor has caused this Agreement to be signed, sealed, and delivered on the day and year first written above.

WITNESS/ATTEST:                    **SUBORDINATING CREDITOR:**

_____              _____

                                    Name: Robert F. McDermott, Jr.

Borrower joins in the execution of this Agreement so as to signify Borrower's acceptance of and consent to the provisions of this Agreement.

WITNESS/ATTEST:                    **BORROWER:**

                                    TESSEMAE'S LLC
                                    A Maryland limited liability company

_____              By: _____(SEAL)
                                        Gregory Vetter
                                        Manager

**Acknowledgments**

_____ OF _____, CITY/COUNTY OF _____, TO WIT:

I HEREBY CERTIFY that on this ____ day of _____, 20____, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Robert F. McDermott, Jr., known to me or satisfactorily proven to be the person named in the foregoing document and acknowledged that he executed the foregoing document for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

                                    _____(SEAL)
                                    NOTARY PUBLIC

My Commission Expires:

_____

7

4841-0043-3760, v. 1

STATE OF MARYLAND, CITY/COUNTY OF Harford , TO WIT:

I HEREBY CERTIFY that on this ___ day of 5 day of April , 20 18, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Gregory Vetter, and acknowledged himself to be a Manager of TESSEMAE'S LLC, a Maryland limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

1-26-2020

```
TAYLER LANE PICKLE
Notary Public
Harford County
Maryland
My Commission Expires Jan. 26, 20__
```

8

C-24-CV-25-003179    Case 1:25-cv-01654-BAH    Document 1-1    Filed 05/23/25    Page 42 of 110

**E-FILED; Baltimore City Circuit Court**
**Docket: 4/23/2025 5:37 PM; Submission: 4/23/2025 5:37 PM**
**Envelope: 20917533**

# EXHIBIT B

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT ("Agreement") is made as of April 10, 2018, in favor of **DEMOCRACY CAPITAL CORPORATION** ("Lender"), by **MCDJR-TESSE, LLC**, a Maryland limited liability company ("Subordinating Creditor").

### Recitals

Tessemae's LLC, a Maryland limited liability company ("Borrower"), has obtained certain credit accommodations from Lender, including a commercial loan in the principal amount of $3,000,000 ("Senior Loan"). The Loan is evidenced by a Consolidated, Amended and Restated Promissory Note dated April 10, 2018 from Borrower to the order of Lender in the principal amount of $3,000,000 ("Senior Note"). As used in this Agreement: (a) the term "Senior Debt" means all present and future indebtedness, liabilities, and obligations of any nature whatsoever of Borrower or any affiliate of, or direct or indirect owner of any interest in, Borrower (collectively with Borrower, "Debtors") to Lender or any affiliate of Lender, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation the Senior Loan, and further including without limitation all principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses owed or incurred in connection with any of the foregoing; and (b) the term "Senior Loan Documents" means collectively any security agreement, mortgage, deed of trust, indemnity deed of trust, collateral pledge agreement, loan agreement, letter of credit application, assignment, promissory note, guaranty, indemnity agreement, or any other instrument or agreement previously, simultaneously, or hereafter executed and delivered by Borrower, any other Debtor or any other person as evidence of, security for, guarantee of, or in connection with, any of the Senior Debt, including without limitation the Senior Note.

Subordinating Creditor has extended certain credit accommodations to Borrower, and has or may hereafter extend additional credit accommodations to Borrower or other Debtors. As used in this Agreement, the term "Subordinated Debt" means all present and future indebtedness, liabilities, and obligations of any nature whatsoever of any Debtor to Subordinating Creditor, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation all principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses owed or incurred in connection with any of the foregoing.

Lender has required, as a condition precedent to making the Senior Loan to Borrower, that Subordinating Creditor execute and deliver this Agreement.

### Agreements

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Subordinating Creditor hereby agrees with Lender as follows:

1) *Payment Subordination*. Subordinating Creditor hereby subordinates the payment of the Subordinated Debt to the payment of the Senior Debt. So long as all or any part of the Senior Debt remains unpaid, Subordinating Creditor shall not, without the prior written consent of Lender, ask, demand, sue for, set off, accept, or receive any payment of all or any part of the Subordinated Debt. Subordinating Creditor shall not subordinate, assign, or transfer all or any part of the Subordinated Debt to any other person without the prior written consent of Lender. Notwithstanding the foregoing provisions of this Section 1, Subordinating Creditor may receive regularly scheduled payments of interest only on the Subordinated Debt (expressly excluding any principal repayment) until such time as Subordinating Creditor receives written notice from Lender that a default has occurred under any of the Senior Loan Documents.

2) *Lien Subordination*. Subordinating Creditor hereby subordinates the priority of all liens, pledges, assignments and security interests of any kind securing the Subordinated Debt in favor of Lender in all liens, pledges, assignments and security interests of any kind securing the Senior Debt, regardless of the time or order of attachment, perfection, or recording. Upon request by Lender, Subordinating Creditor shall execute and deliver to Lender, and hereby authorizes Lender to record, such documents as Lender or its counsel shall deem necessary or desirable to confirm such subordination. If Subordinating Creditor fails to execute or

deliver any such document immediately upon demand, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

3)      *Notice and Cure Rights; Right to Senior Loan Documents*.

i)      Subordinating Creditor shall give Lender notice of any default under the Subordinated Documents (defined below) and shall promptly deliver to Lender copies of all other material notices delivered by or to Subordinating Creditor under the Subordinated Documents.  Lender shall have the right, but no obligation whatsoever, to cure any default under the Subordinated Documents at any time.

ii)      Lender agrees that it will not commence its remedies under the Senior Loan Documents against any of the assets of Borrower, or any portion thereof, without first serving upon Subordinating Creditor a written notice setting forth the claimed default under the Senior Loan Documents.  In each such case and upon such notice, Subordinating Creditor shall have the right to cure any such default within the time permitted under the Senior Loan Documents for cure, provided that: (i) if such default be in the failure to make any required payments of principal or interest or any other required monetary payments, including payment of escrows for taxes and insurance premiums, then Subordinating Creditor shall have not less than 10 days after receipt of such notice to cure such default; and (ii) if such default shall consist of a failure to comply with or perform any other obligation on the part of either Debtor or any other obligor of the Senior Loan, Subordinating Creditor shall have not less than 30 days after receipt of such notice to cure such default.

4)      *Legend*.  Subordinating Creditor agrees to place on the note evidencing the Subordinated Debt and on all other writings or instruments which now or hereafter evidence all or any part of the Subordinated Debt and any substitutions, restatements, extensions, renewals, amendments or modifications thereof or therefor a paragraph substantially the same as the following:

> **SUBORDINATION.  THE INDEBTEDNESS EVIDENCED AND/OR SECURED HEREBY, AS WELL AS ALL RIGHTS AND REMEDIES SET FORTH HEREIN, ARE SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE INDEBTEDNESS EVIDENCED AND SECURED BY THOSE CERTAIN LOAN DOCUMENTS (THE "SENIOR LOAN DOCUMENTS") EVIDENCING AND/OR SECURING THE LOAN IN THE STATED AMOUNT OF $3,000,000 (THE "SENIOR LOAN") MADE BY DEMOCRACY CAPITAL CORPORATION (THE "SENIOR LENDER") TO TESSEMAE'S LLC (THE "BORROWER"), AND THIS INSTRUMENT IS MADE EXPRESSLY SUBJECT TO ALL TERMS OF THAT SUBORDINATION AGREEMENT BY AND AMONG LENDER, SENIOR LENDER, BORROWER AND OTHERS DATED ON OR ABOUT THE DATE HEREOF.**

5)      *Distributions, Etc*.  In the event of any distribution, division, or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of the assets of any Debtor or the proceeds thereof to creditors of any Debtor or to any indebtedness, liabilities, and obligations of any Debtor by reason of the liquidation, dissolution, or other winding up of any Debtor or any Debtor's business or in the event of any sale, receivership, insolvency, or bankruptcy proceeding, or assignment for the benefit of creditors, or any proceeding by or against any Debtor for any relief under the *United States Bankruptcy Code* or any other insolvency law or other law relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions, or extensions, any payment or distribution of any kind or character, whether in cash, securities, or with respect to all or any part of the Subordinated Debt, shall be paid or delivered directly to Lender for application to the Senior Debt, whether or not due and in such order, proportion and manner as Lender may elect in its sole discretion. Subordinating Creditor hereby irrevocably authorizes and empowers Lender to demand, sue for, collect, and receive every such payment or distribution and to give acquittance therefor and to file claims, vote, and take such other proceedings in Lender's own name or in the name of Subordinating Creditor or otherwise as Lender may deem necessary or advisable to carry out the provisions of this Agreement. Subordinating Creditor hereby agrees to execute and deliver to Lender such powers of

attorney, assignments, endorsements, or other instruments as may be required by Lender in order to enable Lender to enforce any and all claims upon or with respect to the Subordinated Debt and to collect and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect to the Subordinated Debt.

6)    *Receipt of Payments by Subordinating Creditor*.  If any payment or distribution not permitted by this Agreement is received by Subordinating Creditor upon or with respect to all or any part of the Subordinated Debt, Subordinating Creditor shall deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Subordinating Creditor where necessary) for application to the Senior Debt, whether or not due and in such order, proportion and manner as Lender may elect, and, until so delivered, such payment or distribution shall be held in trust by Subordinating Creditor as property of Lender. If Subordinating Creditor fails to make any such endorsement or assignment, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

7)    *No Modification of the Subordinated Debt*.  Lender received forms of the documents (collectively, "Subordinated Documents") to be executed in connection with the Subordinated Loan (defined below) prior to extending the Senior Loan, and the form of the Subordinated Documents constituted a material inducement to the making of the Senior Loan. Accordingly, Subordinating Creditor agrees that it shall obtain the prior consent of Lender to any change, amendment or modification of the Subordinated Documents which:  (a) increases the rate of interest on the Subordinated Loan; (b) shortens the maturity date of the Subordinated Loan; (c) increases the principal amount of the Subordinated Loan; (d) releases any party liable for repayment of the Subordinated Loan; (e) changes any default or remedy provision; or (f) changes or imposes any provision which requires principal reductions.  Subordinating Creditor shall provide notice of any such change, amendment or modification to Lender. Subordinating Creditor represents and warrants that as of the date hereof the Subordinated Debt consists of a loan in the principal amount of $350,000 ("Subordinated Loan"). The principal balance owed on the Subordinated Debt shall never exceed $350,000 without the express written consent of Lender.  Lender consents to the making of the Subordinating Loan and agrees that the making of the Subordinated Loan to Borrower shall not constitute a default under the Senior Loan Documents.

8)    *Security for Senior Debt*.  To secure the performance by Subordinating Creditor of the provisions of this Agreement and the payment of the Senior Debt, Subordinating Creditor assigns, pledges, and grants to Lender a security interest in the Subordinated Debt and all proceeds thereof. Upon the request of Lender, Subordinating Creditor shall endorse, assign, and deliver to Lender in a manner acceptable to Lender all notes, instruments, and agreements evidencing, securing, guaranteeing, or made in connection with the Subordinated Debt. If Subordinating Creditor fails to make any such endorsement, assignment, or delivery, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

9)    *Liability of Lender*.  The rights granted to Lender in this Agreement are solely for its protection and nothing herein contained imposes on Lender any duties with respect to the Subordinated Debt or any property of Subordinating Creditor or any Debtor.

10)    *Consents, Waivers, Etc*.  Lender, at any time or from time to time and without further consent of or notice to Subordinating Creditor and without in any manner affecting, impairing, lessening, or releasing any of the provisions of this Agreement, may renew, extend, change the manner, time, place, and terms of payment of, sell, exchange, release, substitute, surrender, realize upon, modify, waive, grant indulgences with respect to, and otherwise deal with in any manner: (a) all or any part of the Senior Debt; (b) all or any of the Senior Loan Documents; (c) all or any part of any property at any time securing all or any part of the Senior Debt; and (d) any person at any time primarily or secondarily liable for all or any part of the Senior Debt or any collateral and security therefor. Subordinating Creditor hereby waives demand, presentment for payment, protest, notice of dishonor and of protest with respect to the Subordinated Debt, notice of acceptance of this Agreement by Lender, notice of the making of any of the Senior Debt, and notice of the occurrence of an event of default under any of the Senior Loan Documents.

11)   *Notices and Communications*.  All notices, demands, requests and other communications required under this Guaranty shall be in writing and shall be deemed to have been properly given if sent by hand delivery, Federal Express (or similar overnight courier service), or by United States certified mail (return receipt requested), postage prepaid, addressed to the party for whom it is intended at its address hereinafter set forth:

| | |
|---|---|
| If to Subordinating Creditor: | MCDJR-Tesse, LLC |
| | 4455 South Holly Street |
| | Cherry Hills Village, CO 80111 |
| | |
| If to Lender: | Democracy Capital Corporation |
| | 4800 Montgomery Lane, 10th Floor |
| | Bethesda, Maryland 20814 |
| | |
| | With copies to: |
| | |
| | Brian C. Rosenberg |
| | Rosenberg Pelino LLC |
| | 6031 University Boulevard, Suite 300 |
| | Ellicott City, Maryland 21043 |

Notice shall be deemed given as of the date of hand delivery, as of the date specified for delivery if by overnight courier service or as of 2 days after the date of mailing, as the case may be.

12)   *Lender's Successors and Assigns*.  If any of the Senior Debt is transferred or assigned by Lender, this Agreement shall inure to the benefit of Lender's transferee or assignee to the extent of such transfer or assignment, provided that Lender shall continue to have the unimpaired right to enforce this Agreement as to any of the Senior Debt not so transferred or assigned.

13)   *No Waiver*.  This Agreement shall not be affected, impaired, or released by the delay or failure of Lender to exercise any of its rights and remedies against any Debtor or under any of the Senior Loan Documents or against any collateral or security for the Senior Debt. No delay or failure on the part of Lender to exercise any of its rights or remedies hereunder or now or hereafter existing at law or in equity or by statute or otherwise, or any partial or single exercise thereof, shall constitute a waiver thereof. All such rights and remedies are cumulative and may be exercised singly or concurrently and the exercise of any one or more of them will not be a waiver of any other. No waiver of any of its rights and remedies hereunder and no modification or amendment of this Agreement shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights and remedies of Lender hereunder in any other respect at any other time.

14)   *Participations*.  Lender shall have the right to grant participations in the Senior Debt to others at any time and from time to time, and Lender may divulge to any such participant or potential participant all information, reports, financial statements, and documents obtained in connection with this Agreement, any of the Senior Loan Documents, or otherwise.

15)   *Severability*.  If any term of this Agreement or any obligation thereunder shall be held to be invalid, illegal, or unenforceable, the remainder of this Agreement and any other application of such term shall not be affected thereby.

16)   *Counterparts*.  This Agreement may be executed in duplicate originals or in several counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument, and it shall not be necessary in making proof hereof to produce or account for more than one such duplicate, original, or counterpart.

4

17) _Binding Agreement_.  This Agreement shall be binding upon the heirs, personal representatives, successors, and assigns of Subordinating Creditor and shall inure to the benefit of the successors and assigns of Lender.

18) _Miscellaneous_.  As used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders, as the context may require, and the term "person" shall include an individual, a corporation, an association, a partnership, a limited liability company, a trust, an organization or any other legal entity. The paragraph headings of this Agreement are for convenience only and shall not limit or otherwise affect any of the terms hereof.

19) _Governing Law_.  This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland and shall be deemed to be executed, delivered, and accepted in the State of Maryland.

20) _JURY TRIAL WAIVER_.  LENDER AND SUBORDINATING CREDITOR JOINTLY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH LENDER AND SUBORDINATING CREDITOR MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY SUBORDINATING CREDITOR, AND SUBORDINATING CREDITOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. SUBORDINATING CREDITOR FURTHER REPRESENTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**[SIGNATURE PAGE FOLLOWS]**

4842-1341-6801, v. 1

IN WITNESS WHEREOF, Subordinating Creditor has caused this Agreement to be signed, sealed, and delivered on the day and year first written above.

WITNESS/ATTEST:                          **SUBORDINATING CREDITOR**:

                                         MCDJR-TESSE, LLC
                                         a Maryland limited liability company

_____                  By: _____ (SEAL)
                                             Name: Robert F. McDermott, Jr.
                                             Title:  Sole Member


**Acknowledgments**

STATE _____ OF _COLORADO_____, CITY/COUNTY OF _Arapahoe_____, TO WIT:

I HEREBY CERTIFY that on this _10_ day of April, 2018, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Robert F. McDermott, Jr., and acknowledged himself to be the sole member of MCDJR-Tesse, LLC, a Maryland limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

                                         _____ (SEAL)
                                         NOTARY PUBLIC

My Commission Expires:

_03.14.2019_

> STEVEN ZAUGG
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY iD 20034009024
> MY COMMISSION EXPIRES 03/14/2019

6

Borrower joins in the execution of this Agreement so as to signify Borrower's acceptance of and consent to the provisions of this Agreement.

WITNESS/ATTEST:                              **BORROWER**:

                                            TESSEMAE'S LLC
                                            A Maryland Limited Liability Company

*Larus Zingle*                              By: _____ (SEAL)
                                            Gregory Vetter
                                            Manager and Chief Executive Officer

STATE OF MARYLAND, CITY/COUNTY OF *Harford*, TO WIT:

I HEREBY CERTIFY that on this *5* day of April, 2018, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Gregory Vetter, and acknowledged himself to be a Manager and the Chief Executive Officer of TESSEMAE'S LLC, a Maryland limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

*1-26-2020*

TAYLER LANE PICKLE
Notary Public
Harford County
Maryland
My Commission Expires Jan. 26, 2020

7

C-24-CV-25-003179

Case 1:25-cv-01654-BAH    Document 1-1    Filed 05/23/25    Page 50 of 110

**E-FILED; Baltimore City Circuit Court**
**Docket: 4/23/2025 5:37 PM; Submission: 4/23/2025 5:37 PM**
**Envelope: 20917533**

# EXHIBIT C

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT ("Agreement") is made as of April 10, 2018, in favor of **DEMOCRACY CAPITAL CORPORATION** ("Lender"), by **PETER MCDERMOTT** ("Subordinating Creditor").

### Recitals

Tessemae's LLC, a Maryland limited liability company ("Borrower"), has applied to Lender for certain credit accommodations, including without limitation a commercial loan in the principal amount of $3,000,000 (collectively, "Senior Loan"). The Senior Loan is intended to be evidenced by a Promissory Note from Borrower to the order of Lender in the principal amount of $3,000,000 ("Senior Note"). As used in this Agreement: (a) the term "Senior Debt" means all present and future indebtedness, liabilities, and obligations of any nature whatsoever of Borrower or any affiliate of, or direct or indirect owner of any interest in, Borrower (collectively with Borrower, "Debtors") to Lender or any affiliate of Lender, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation the Senior Loan, and further including without limitation all principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses owed or incurred in connection with any of the foregoing; and (b) the term "Senior Loan Documents" means collectively any security agreement, mortgage, deed of trust, indemnity deed of trust, collateral pledge agreement, loan agreement, letter of credit application, assignment, promissory note, guaranty, indemnity agreement, or any other instrument or agreement previously, simultaneously, or hereafter executed and delivered by Borrower, any other Debtor or any other person as evidence of, security for, guarantee of, or in connection with, any of the Senior Debt, including without limitation the Senior Note.

Subordinating Creditor has extended certain credit accommodations to Borrower, and has or may hereafter extend additional credit accommodations to Borrower or other Debtors. As used in this Agreement, the term "Subordinated Debt" means all present and future indebtedness, liabilities, claims and obligations of any nature whatsoever of any Debtor to Subordinating Creditor, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation all principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses owed or incurred in connection with any of the foregoing.

Lender has required, as a condition precedent to making the Senior Loan to Borrower, that Subordinating Creditor execute and deliver this Agreement.

### Agreements

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Subordinating Creditor hereby agrees with Lender as follows:

1.    *Payment Subordination*. Subordinating Creditor hereby subordinates the payment of the Subordinated Debt to the payment of the Senior Debt and to all other indebtedness secured by any or all of the assets of Borrower ("Other Secured Debt"). So long as all or any part of the Senior Debt or all or any part of any Other Secured Debt remains unpaid, Subordinating Creditor shall not, without the prior written consent of Lender and the holders of all Other Secured Debt (collectively, "Other Secured Debt Holders"), ask, demand, sue for, set off, accept or receive any payment of all or any part of the Subordinated Debt. Notwithstanding the foregoing provisions of this Section 1, from the date that is 6 months after receipt by Lender and each Other Secured Debt Holder known to Borrower of an Approved Modification (defined below) to the Subordinated Debt until such time as Subordinating Creditor receives written notice from Lender or any Other Secured Debt Holder that a default has occurred under any of the Senior Loan Documents, the Senior Debt or any Other Secured Debt, Subordinating Creditor may receive regularly scheduled payments of interest only on the Subordinated Debt (but may not receive any principal payments). Subordinating Creditor shall not subordinate, assign, or transfer all or any part of the Subordinated Debt to any other person without the prior written consent of Lender and all Other Secured Debt Holders.

2.    *Lien Subordination*.  Subordinating Creditor hereby subordinates the priority of all liens, pledges, assignments and security interests of any kind securing the Subordinated Debt in favor of all liens, pledges, assignments and security interests of any kind securing the Senior Debt and the Other Secured Debt, regardless of the time or order of attachment, perfection, or recording. Upon request by Lender or any Other Secured Debt Holder, Subordinating Creditor shall execute and deliver to Lender or such Other Secured Debt, and hereby authorizes Lender or such Other Secured Debt to record, such documents as Lender, such Other Secured Debt or their respective counsel shall deem necessary or desirable to confirm such subordination. If Subordinating Creditor fails to execute or deliver any such document immediately upon demand, Lender or such Other Secured Debt Holder, or any of their respective officers or employees on behalf of Lender or such Other Secured Debt Holder, is hereby irrevocably authorized to make the same.

3.    *Notice and Cure Rights*.  Subordinating Creditor shall give Lender and each Other Secured Debt Holder notice of any default under the Subordinated Documents (defined below) and shall promptly deliver to Lender and each Other Secured Debt copies of all other material notices delivered by or to Subordinating Creditor under the Subordinated Documents. Lender and each Other Secured Debt Holder shall have the right, but no obligation whatsoever, to cure any default under the Subordinated Documents at any time. These provisions are intended for the benefit of, and shall benefit, Lender and each Other Secured Debt Holder only and may not be used or interposed as a defense by Borrower or any other Debtor in any proceeding with or against Lender or any Other Secured Debt Holder. Neither Lender nor any Other Secured Debt Holder shall be obligated to exercise its right to cure set forth in this Section 3, but shall have the option to do so in its discretion.

4.    *Distributions, Etc*.  In the event of any distribution, division, or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of the assets of any Debtor or the proceeds thereof to creditors of any Debtor or to any indebtedness, liabilities, and obligations of any Debtor by reason of the liquidation, dissolution, or other winding up of any Debtor or any Debtor's business or in the event of any sale, receivership, insolvency, or bankruptcy proceeding, or assignment for the benefit of creditors, or any proceeding by or against any Debtor for any relief under the *United States Bankruptcy Code* or any other insolvency law or other law relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions, or extensions, any payment or distribution of any kind or character, whether in cash, securities, or with respect to all or any part of the Subordinated Debt, shall be paid or delivered directly to Lender for application to the Senior Debt, whether or not due and in such order, proportion and manner as Lender may elect in its sole discretion. Subordinating Creditor hereby irrevocably authorizes and empowers Lender to demand, sue for, collect, and receive every such payment or distribution and to give acquittance therefor and to file claims, vote, and take such other proceedings in Lender's own name or in the name of Subordinating Creditor or otherwise as Lender may deem necessary or advisable to carry out the provisions of this Agreement. Subordinating Creditor hereby agrees to execute and deliver to Lender such powers of attorney, assignments, endorsements, or other instruments as may be required by Lender in order to enable Lender to enforce any and all claims upon or with respect to the Subordinated Debt and to collect and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect to the Subordinated Debt.

5.    *Receipt of Payments by Subordinating Creditor*.  If any payment or distribution not permitted by this Agreement is received by Subordinating Creditor upon or with respect to all or any part of the Subordinated Debt, Subordinating Creditor shall deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Subordinating Creditor where necessary) for application to the Senior Debt, whether or not due and in such order, proportion and manner as Lender may elect, and, until so delivered, such payment or distribution shall be held in trust by Subordinating Creditor as property of Lender. If Subordinating Creditor fails to make any such endorsement or assignment, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

6.    *No Modification of the Subordinated Debt*.  The form and substance of the documents executed in connection with the Subordinated Debt (collectively, "Subordinated Documents") constitute a material inducement to the making of the Senior Loan and the Other Secured Debt, and Subordinating Creditor agrees that it shall obtain the prior written consent of Lender and each Other Secured Debt Holder to any

2

change, amendment or modification of the Subordinated Documents executed prior to the date hereof and to any new Subordinated Documents after the date hereof; provided, however, that Lender's and the Other Secured Debt Holders' consent shall not be required in connection with a written agreement that modifies the Subordinated Documents to reflect the following terms and contains no other material terms for the benefit of Subordinated Creditor ("Approved Modification"): (a) a reduction in the rate of interest accruing on the outstanding principal balance of the Subordinated Debt to not more than 5.00% *per annum*, with a default rate of not more than 10.00% *per annum*; (b) payments of interest only not more than monthly and no payments required for at least 6 months following the date of execution of such modification agreement; (c) a maturity date of not less than 3 years from the date of execution of such modification agreement; (d) if applicable, a reduction in the outstanding principal balance of the Subordinated Debt to the original principal amount of the Subordinated Debt at the time the Subordinated Debt was originally extended, and any principal amounts over the original principal amount shall be shall be forgiven and forfeited by Subordinated Creditor for no consideration other than as permitted by the following sentence; and (e) all interest that has accrued on the Subordinated Debt (including any payment in kind) through the date of execution of such modification shall be forgiven and forfeited by Subordinated Creditor. Subordinated Creditor shall not be obligated to forego any conversion rights, warrants or other equity rights or interests in connection with the execution of an Approved Modification and nothing in this Agreement shall prohibit Borrower from modifying the terms, or increasing the amount, of any conversion rights, warrants or other equity rights or interests of Subordinating Creditor in connection with, or as a consequence of, any Approved Modification, provided that any such rights or interests that constitute or may constitute "Subordinated Debt" shall be subject to the terms of this Agreement. Subordinating Creditor represents and warrants that, as of the date hereof, the Subordinated Debt consists of certain loans in the aggregate principal amount of $750,000. The principal balance owed on the Subordinated Debt, as amended by an Approved Modification, if applicable, shall never exceed such amount without the prior written consent of Lender and each Other Secured Debt Holder.

7.    *Security for Senior Debt*. To secure the performance by Subordinating Creditor of the provisions of this Agreement and the payment of the Senior Debt, Subordinating Creditor assigns, pledges, and grants to Lender a security interest in the Subordinated Debt and all proceeds thereof. Upon the request of Lender, Subordinating Creditor shall endorse, assign, and deliver to Lender in a manner acceptable to Lender all notes, instruments, and agreements evidencing, securing, guaranteeing, or made in connection with the Subordinated Debt. If Subordinating Creditor fails to make any such endorsement, assignment, or delivery, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

8.    *Liability of Lender*. The rights granted to Lender in this Agreement are solely for its protection and nothing herein contained imposes on Lender or any Other Secured Debt Holder any duties with respect to the Subordinated Debt or any property of Subordinating Creditor or any Debtor.

9.    *Consents, Waivers, Etc*. Lender and each Other Secured Debt Holder, at any time or from time to time and without further consent of or notice to Subordinating Creditor and without in any manner affecting, impairing, lessening, or releasing any of the provisions of this Agreement, may renew, extend, change the manner, time, place, and terms of payment of, sell, exchange, release, substitute, surrender, realize upon, modify, waive, grant indulgences with respect to, and otherwise deal with in any manner: (a) all or any part of the Senior Debt; (b) all or any of the Senior Loan Documents; (c) all or any part of any property at any time securing all or any part of the Senior Debt; and (d) any person at any time primarily or secondarily liable for all or any part of the Senior Debt or any collateral and security therefor. Subordinating Creditor hereby waives demand, presentment for payment, protest, notice of dishonor and of protest with respect to the Subordinated Debt, notice of acceptance of this Agreement by Lender, notice of the making of any of the Senior Debt or any Other Secured Debt, and notice of the occurrence of an event of default under any of the Senior Loan Documents or any document evidencing or securing the Other Secured Debt ("Other Secured Debt Documents").

10.    *Other Secured Debt Holders*. Subject to the terms of this Section 10, the Other Secured Debt Holders shall be deemed third party beneficiaries of the rights and benefits of Lender under this Agreement. At such time as all Senior Debt is indefeasibly paid in full and all of the provisions of the Senior Loan

3

Documents are no longer in effect, or in the event Lender affirmatively elects in writing not to enforce its rights under Sections 4, 5 and 7 of this Agreement, Other Secured Debt Holders shall be entitled to enforce the terms of Sections 4, 5 and 7 of this Agreement as "Lender" hereunder. In the event that there is more than 1 Other Secured Debt Holder, all Other Secured Debt Holders must agree on any action to be taken by Other Secured Debt Holders hereunder. Notwithstanding anything to the contrary contained herein, no Other Secured Debt Holder shall be entitled to any of the benefits of this Agreement or have any rights under this Agreement until such time as such Other Secured Debt Holder has delivered written notice to Subordinating Creditor and Lender of the extension of the Other Secured Debt held by such Other Secured Debt Holder, together with a written agreement acknowledging and consenting to, and agreeing to be bound by, the terms and provisions of this Agreement and a subordination agreement in form and substance acceptable to Lender subordinating the lien and security interest of any relevant Other Secured Debt Documents to the lien and security interest of the Senior Loan Documents and subordinating payment of such Other Secured Debt to payment of the Senior Debt; and, until such time as all of the Senior Debt is indefeasibly paid in full and all of the provisions of the Senior Loan Documents are no longer in effect, no Other Secured Debt Holder shall have any right to enforce this Agreement or any other rights of such Other Secured Debt Holder under any of the Other Secured Debt Documents without the express written consent of Lender. Further, until such time as all of the Senior Debt is indefeasibly paid in full and all of the provisions of the Senior Loan Documents are no longer in effect, each Other Secured Debt Holder shall be deemed to have unconditionally waived any right to subrogation against Lender and any right to subrogation, reimbursement, and indemnity against any property or other security for any or all of the Senior Debt or under any or all of the Senior Loan Documents. No act or omission of any Other Secured Debt Holder shall affect, impair or lessen any right or remedy of Lender hereunder, under any Senior Loan Document or otherwise. In the event of any conflict between the terms and provisions of this Agreement and the terms of any Other Secured Debt Document, the terms and provisions of this Agreement shall control. In the event of any inconsistencies or ambiguities among the terms and provisions of this Agreement, any of the Senior Loan Documents, any of the Other Secured Debt Documents or any other document, Lender shall determine in good faith how such inconsistency or ambiguity shall be construed, interpreted or resolved, and Lender's election of which interpretation or construction is for Lender's benefit, if made in good faith, shall govern. If consent or approval of any Other Secured Debt Holder is required hereunder or otherwise required for any action proposed by Borrower, then Lender, in Lender's sole discretion, shall have the right to grant or withhold such consent or approval on behalf of such Other Secured Debt Holder after the occurrence of a default on the Senior Debt.

11. *Notices and Communications*. All notices, demands, requests and other communications required under this Agreement shall be in writing and shall be deemed to have been properly given if sent by hand delivery, Federal Express (or similar overnight courier service), or by United States certified mail (return receipt requested), postage prepaid, addressed to the party for whom it is intended at its address hereinafter set forth:

> If to Subordinating Creditor:   Peter McDermott
> 1 Pond Drive
> Englewood, Colorado 88113

> If to Lender:   Democracy Capital Corporation
> 4800 Montgomery Lane, 10th Floor
> Bethesda, Maryland 20814

> With copies to:

> Brian C. Rosenberg
> Rosenberg Pelino LLC
> 6031 University Boulevard, Suite 300
> Ellicott City, Maryland 21043

Notice shall be deemed given as of the date of hand delivery, as of the date specified for delivery if by overnight courier service or as of 2 days after the date of mailing, as the case may be. Each Other Secured

4

Debt Holder shall notify Lender and Subordinating Creditor of its address for notices and all notices hereunder to Lender shall be delivered to each Other Secured Debt Holder.

12.      *Lender's Successors and Assigns*.  If any of the Senior Debt or any Other Secured Debt is transferred or assigned by the holder thereof, this Agreement shall inure to the benefit of such holder's respective transferees or assignees to the extent of such transfer or assignment, provided that Lender or any such Other Secured Debt Holder shall continue to have the unimpaired right to enforce this Agreement as to any of the Senior Debt or Other Secured Debt not so transferred or assigned.

13.      *No Waiver*.  This Agreement shall not be affected, impaired, or released by the delay or failure of Lender or any Other Secured Debt Holder to exercise any of its rights and remedies against any Debtor or under any of the Senior Loan Documents or any of the Other Secured Debt Documents or against any collateral or security for the Senior Debt or the Other Secured Debt. No delay or failure on the part of Lender or any Other Secured Debt Holder to exercise any of its rights or remedies hereunder or now or hereafter existing at law or in equity or by statute or otherwise, or any partial or single exercise thereof, shall constitute a waiver thereof. All such rights and remedies are cumulative and may be exercised singly or concurrently and the exercise of any one or more of them will not be a waiver of any other. No waiver of any of its rights and remedies hereunder and no modification or amendment of this Agreement shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights and remedies of Lender hereunder in any other respect at any other time. No waiver of any of its rights and remedies hereunder and no modification or amendment of this Agreement shall be deemed to be made by any Other Secured Debt Holder unless the same shall be in writing, duly signed on behalf of such Other Secured Debt Holder, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights and remedies of such Other Secured Debt Holder hereunder in any other respect at any other time.

14.      *Participations*.  Lender shall have the right to grant participations in the Senior Debt to others at any time and from time to time, and Lender may divulge to any such participant or potential participant all information, reports, financial statements, and documents obtained in connection with this Agreement, any of the Senior Loan Documents, or otherwise.

15.      *Severability*.  If any term of this Agreement or any obligation thereunder shall be held to be invalid, illegal, or unenforceable, the remainder of this Agreement and any other application of such term shall not be affected thereby.

16.      *Counterparts*.  This Agreement may be executed in duplicate originals or in several counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument, and it shall not be necessary in making proof hereof to produce or account for more than one such duplicate, original, or counterpart.

17.      *Binding Agreement*.  This Agreement shall be binding upon the heirs, personal representatives, successors, and assigns of Subordinating Creditor and shall inure to the benefit of the successors and assigns of Lender.

18.      *Miscellaneous*.  As used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders, as the context may require, and the term "person" shall include an individual, a corporation, an association, a partnership, a limited liability company, a trust, an organization or any other legal entity. The paragraph headings of this Agreement are for convenience only and shall not limit or otherwise affect any of the terms hereof.

19.      *Governing Law*.  This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland and shall be deemed to be executed, delivered, and accepted in the State of Maryland.

5

20.   *JURY TRIAL WAIVER.*  LENDER AND SUBORDINATING CREDITOR JOINTLY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH LENDER AND SUBORDINATING CREDITOR MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY SUBORDINATING CREDITOR, AND SUBORDINATING CREDITOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. SUBORDINATING CREDITOR FURTHER REPRESENTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**[SIGNATURE PAGE FOLLOWS]**

6

IN WITNESS WHEREOF, Subordinating Creditor has caused this Agreement to be signed, sealed, and delivered on the day and year first written above.

WITNESS/ATTEST:                               **SUBORDINATING CREDITOR:**

_____                     _____
                                              Name: Peter McDermott

Borrower joins in the execution of this Agreement so as to signify Borrower's acceptance of and consent to the provisions of this Agreement.

WITNESS/ATTEST:                               **BORROWER:**

                                              TESSEMAE'S LLC
                                              A Maryland limited liability company

_____           By:       _____(SEAL)
                                              Gregory Vetter
                                              Manager

**Acknowledgments**

*STATE*_____ OF *COLORADO*_____, CITY/COUNTY OF __*DENVER*____, TO WIT:

I HEREBY CERTIFY that on this ____ day of _____, 20____, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Peter McDermott, known to me or satisfactorily proven to be the person named in the foregoing document and acknowledged that he executed the foregoing document for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____(SEAL)
NOTARY PUBLIC

My Commission Expires:

December 26, 2018

CHERYL SIMON-MEQUET
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20064051182
MY COMMISSION EXPIRES DECEMBER 26, 2018

7

IN WITNESS WHEREOF, Subordinating Creditor has caused this Agreement to be signed, sealed, and delivered on the day and year first written above.

WITNESS/ATTEST:                           **SUBORDINATING CREDITOR:**

_____          _____

                                          Name: Peter McDermott

Borrower joins in the execution of this Agreement so as to signify Borrower's acceptance of and consent to the provisions of this Agreement.

WITNESS/ATTEST:                           **BORROWER:**

                                          TESSEMAE'S LLC
                                          A Maryland limited liability company

_____          By: _____(SEAL)
                                               Gregory Vetter
                                               Manager

**Acknowledgments**

_____ OF _____, CITY/COUNTY OF _____, TO WIT:

I HEREBY CERTIFY that on this _____ day of _____, 20_____, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Peter McDermott, known to me or satisfactorily proven to be the person named in the foregoing document and acknowledged that he executed the foregoing document for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

                                          _____(SEAL)
                                          NOTARY PUBLIC

My Commission Expires:

_____

7

STATE OF MARYLAND, CITY/COUNTY OF Harford, TO WIT:

I HEREBY CERTIFY that on this ____ day of 5 day of April, 2018, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Gregory Vetter, and acknowledged himself to be a Manager of TESSEMAE'S LLC, a Maryland limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

Tayler Pickle (SEAL)
NOTARY PUBLIC

My Commission Expires:

1-26-2020

**TAYLER LANE PICKLE**
Notary Public
Harford County
Maryland
My Commission Expires Jan. 26, ~~~

8

E-FILED; Baltimore City Circuit Court
Docket: 4/23/2025 5:37 PM; Submission: 4/23/2025 5:37 PM
Envelope: 20917533

# EXHIBIT D

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT ("Agreement") is made as of April 10, 2018, in favor of **DEMOCRACY CAPITAL CORPORATION** ("Lender"), by **PMCDTESSE, LLC**, a Maryland limited liability company ("Subordinating Creditor").

### Recitals

Tessemae's LLC, a Maryland limited liability company ("Borrower"), has obtained certain credit accommodations from Lender, including a commercial loan in the principal amount of $3,000,000 ("Senior Loan"). The Loan is evidenced by a Consolidated, Amended and Restated Promissory Note dated April 10, 2018 from Borrower to the order of Lender in the principal amount of $3,000,000 ("Senior Note"). As used in this Agreement: (a) the term "Senior Debt" means all present and future indebtedness, liabilities, and obligations of any nature whatsoever of Borrower or any affiliate of, or direct or indirect owner of any interest in, Borrower (collectively with Borrower, "Debtors") to Lender or any affiliate of Lender, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation the Senior Loan, and further including without limitation all principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses owed or incurred in connection with any of the foregoing; and (b) the term "Senior Loan Documents" means collectively any security agreement, mortgage, deed of trust, indemnity deed of trust, collateral pledge agreement, loan agreement, letter of credit application, assignment, promissory note, guaranty, indemnity agreement, or any other instrument or agreement previously, simultaneously, or hereafter executed and delivered by Borrower, any other Debtor or any other person as evidence of, security for, guarantee of, or in connection with, any of the Senior Debt, including without limitation the Senior Note.

Subordinating Creditor has extended certain credit accommodations to Borrower, and has or may hereafter extend additional credit accommodations to Borrower or other Debtors. As used in this Agreement, the term "Subordinated Debt" means all present and future indebtedness, liabilities, and obligations of any nature whatsoever of any Debtor to Subordinating Creditor, whether direct or indirect, liquidated or contingent, primary or secondary, alone or jointly with others, due or to become due, secured or unsecured, now existing or hereafter created, including without limitation all principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses owed or incurred in connection with any of the foregoing.

Lender has required, as a condition precedent to making the Senior Loan to Borrower, that Subordinating Creditor execute and deliver this Agreement.

### Agreements

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Subordinating Creditor hereby agrees with Lender as follows:

1)      _Payment Subordination_.    Subordinating Creditor hereby subordinates the payment of the Subordinated Debt to the payment of the Senior Debt. So long as all or any part of the Senior Debt remains unpaid, Subordinating Creditor shall not, without the prior written consent of Lender, ask, demand, sue for, set off, accept, or receive any payment of all or any part of the Subordinated Debt. Subordinating Creditor shall not subordinate, assign, or transfer all or any part of the Subordinated Debt to any other person without the prior written consent of Lender. Notwithstanding the foregoing provisions of this Section 1, Subordinating Creditor may receive regularly scheduled payments of interest only on the Subordinated Debt (expressly excluding any principal repayment) until such time as Subordinating Creditor receives written notice from Lender that a default has occurred under any of the Senior Loan Documents.

2)      _Lien Subordination_.    Subordinating Creditor hereby subordinates the priority of all liens, pledges, assignments and security interests of any kind securing the Subordinated Debt in favor of all liens, pledges, assignments and security interests of any kind securing the Senior Debt, regardless of the time or order of attachment, perfection, or recording. Upon request by Lender, Subordinating Creditor shall execute and deliver to Lender, and hereby authorizes Lender to record, such documents as Lender or its counsel shall deem necessary or desirable to confirm such subordination. If Subordinating Creditor fails to execute or

deliver any such document immediately upon demand, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

3)    *Notice and Cure Rights; Right to Senior Loan Documents*.

i)    Subordinating Creditor shall give Lender notice of any default under the Subordinated Documents (defined below) and shall promptly deliver to Lender copies of all other material notices delivered by or to Subordinating Creditor under the Subordinated Documents. Lender shall have the right, but no obligation whatsoever, to cure any default under the Subordinated Documents at any time.

ii)    Lender agrees that it will not commence its remedies under the Senior Loan Documents against any of the assets of Borrower, or any portion thereof, without first serving upon Subordinating Creditor a written notice setting forth the claimed default under the Senior Loan Documents. In each such case and upon such notice, Subordinating Creditor shall have the right to cure any such default within the time permitted under the Senior Loan Documents for cure, provided that: (i) if such default be in the failure to make any required payments of principal or interest or any other required monetary payments, including payment of escrows for taxes and insurance premiums, then Subordinating Creditor shall have not less than 10 days after receipt of such notice to cure such default; and (ii) if such default shall consist of a failure to comply with or perform any other obligation on the part of either Debtor or any other obligor of the Senior Loan, Subordinating Creditor shall have not less than 30 days after receipt of such notice to cure such default.

4)    *Legend*. Subordinating Creditor agrees to place on the note evidencing the Subordinated Debt and on all other writings or instruments which now or hereafter evidence all or any part of the Subordinated Debt and any substitutions, restatements, extensions, renewals, amendments or modifications thereof or therefor a paragraph substantially the same as the following:

> **SUBORDINATION. THE INDEBTEDNESS EVIDENCED AND/OR SECURED HEREBY, AS WELL AS ALL RIGHTS AND REMEDIES SET FORTH HEREIN, ARE SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE INDEBTEDNESS EVIDENCED AND SECURED BY THOSE CERTAIN LOAN DOCUMENTS (THE "SENIOR LOAN DOCUMENTS") EVIDENCING AND/OR SECURING THE LOAN IN THE STATED AMOUNT OF $3,000,000 (THE "SENIOR LOAN") MADE BY DEMOCRACY CAPITAL CORPORATION (THE "SENIOR LENDER") TO TESSEMAE'S LLC (THE "BORROWER"), AND THIS INSTRUMENT IS MADE EXPRESSLY SUBJECT TO ALL TERMS OF THAT SUBORDINATION AGREEMENT BY AND AMONG LENDER, SENIOR LENDER, BORROWER AND OTHERS DATED ON OR ABOUT THE DATE HEREOF.**

5)    *Distributions, Etc*. In the event of any distribution, division, or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of the assets of any Debtor or the proceeds thereof to creditors of any Debtor or to any indebtedness, liabilities, and obligations of any Debtor by reason of the liquidation, dissolution, or other winding up of any Debtor or any Debtor's business or in the event of any sale, receivership, insolvency, or bankruptcy proceeding, or assignment for the benefit of creditors, or any proceeding by or against any Debtor for any relief under the *United States Bankruptcy Code* or any other insolvency law or other law relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions, or extensions, any payment or distribution of any kind or character, whether in cash, securities, or with respect to all or any part of the Subordinated Debt, shall be paid or delivered directly to Lender for application to the Senior Debt, whether or not due and in such order, proportion and manner as Lender may elect in its sole discretion. Subordinating Creditor hereby irrevocably authorizes and empowers Lender to demand, sue for, collect, and receive every such payment or distribution and to give acquittance therefor and to file claims, vote, and take such other proceedings in Lender's own name or in the name of Subordinating Creditor or otherwise as Lender may deem necessary or advisable to carry out the provisions of this Agreement. Subordinating Creditor hereby agrees to execute and deliver to Lender such powers of

2

attorney, assignments, endorsements, or other instruments as may be required by Lender in order to enable Lender to enforce any and all claims upon or with respect to the Subordinated Debt and to collect and receive any and all payments or distributions which may be payable or deliverable at any time upon or with respect to the Subordinated Debt.

6)      _Receipt of Payments by Subordinating Creditor_.  If any payment or distribution not permitted by this Agreement is received by Subordinating Creditor upon or with respect to all or any part of the Subordinated Debt, Subordinating Creditor shall deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Subordinating Creditor where necessary) for application to the Senior Debt, whether or not due and in such order, proportion and manner as Lender may elect, and, until so delivered, such payment or distribution shall be held in trust by Subordinating Creditor as property of Lender. If Subordinating Creditor fails to make any such endorsement or assignment, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

7)      _No Modification of the Subordinated Debt_.  Lender received forms of the documents (collectively, "Subordinated Documents") to be executed in connection with the Subordinated Loan (defined below) prior to extending the Senior Loan, and the form of the Subordinated Documents constituted a material inducement to the making of the Senior Loan.  Accordingly, Subordinating Creditor agrees that it shall obtain the prior consent of Lender to any change, amendment or modification of the Subordinated Documents which:  (a) increases the rate of interest on the Subordinated Loan; (b) shortens the maturity date of the Subordinated Loan; (c) increases the principal amount of the Subordinated Loan; (d) releases any party liable for repayment of the Subordinated Loan; (e) changes any default or remedy provision; or (f) changes or imposes any provision which requires principal reductions.  Subordinating Creditor shall provide notice of any such change, amendment or modification to Lender. Subordinating Creditor represents and warrants that as of the date hereof the Subordinated Debt consists of a loan in the principal amount of $300,000 ("Subordinated Loan"). The principal balance owed on the Subordinated Debt shall never exceed $300,000 without the express written consent of Lender.  Lender consents to the making of the Subordinating Loan and agrees that the making of the Subordinated Loan to Borrower shall not constitute a default under the Senior Loan Documents.

8)      _Security for Senior Debt_.  To secure the performance by Subordinating Creditor of the provisions of this Agreement and the payment of the Senior Debt, Subordinating Creditor assigns, pledges, and grants to Lender a security interest in the Subordinated Debt and all proceeds thereof. Upon the request of Lender, Subordinating Creditor shall endorse, assign, and deliver to Lender in a manner acceptable to Lender all notes, instruments, and agreements evidencing, securing, guaranteeing, or made in connection with the Subordinated Debt. If Subordinating Creditor fails to make any such endorsement, assignment, or delivery, Lender, or any of its officers or employees on behalf of Lender, is hereby irrevocably authorized to make the same.

9)      _Liability of Lender_.  The rights granted to Lender in this Agreement are solely for its protection and nothing herein contained imposes on Lender any duties with respect to the Subordinated Debt or any property of Subordinating Creditor or any Debtor.

10)     _Consents, Waivers, Etc_.  Lender, at any time or from time to time and without further consent of or notice to Subordinating Creditor and without in any manner affecting, impairing, lessening, or releasing any of the provisions of this Agreement, may renew, extend, change the manner, time, place, and terms of payment of, sell, exchange, release, substitute, surrender, realize upon, modify, waive, grant indulgences with respect to, and otherwise deal with in any manner: (a) all or any part of the Senior Debt; (b) all or any of the Senior Loan Documents; (c) all or any part of any property at any time securing all or any part of the Senior Debt; and (d) any person at any time primarily or secondarily liable for all or any part of the Senior Debt or any collateral and security therefor. Subordinating Creditor hereby waives demand, presentment for payment, protest, notice of dishonor and of protest with respect to the Subordinated Debt, notice of acceptance of this Agreement by Lender, notice of the making of any of the Senior Debt, and notice of the occurrence of an event of default under any of the Senior Loan Documents.

11)    _Notices and Communications_.  All notices, demands, requests and other communications required under this Guaranty shall be in writing and shall be deemed to have been properly given if sent by hand delivery, Federal Express (or similar overnight courier service), or by United States certified mail (return receipt requested), postage prepaid, addressed to the party for whom it is intended at its address hereinafter set forth:

| | |
|---|---|
| If to Subordinating Creditor: | PMcDTesse, LLC |
| | 1 Pond Drive |
| | Englewood, CO 80113 |
| | |
| If to Lender: | Democracy Capital Corporation |
| | 4800 Montgomery Lane, 10th Floor |
| | Bethesda, Maryland 20814 |
| | |
| | With copies to: |
| | |
| | Brian C. Rosenberg |
| | Rosenberg Pelino LLC |
| | 6031 University Boulevard, Suite 300 |
| | Ellicott City, Maryland 21043 |

Notice shall be deemed given as of the date of hand delivery, as of the date specified for delivery if by overnight courier service or as of 2 days after the date of mailing, as the case may be.

12)    _Lender's Successors and Assigns_.  If any of the Senior Debt is transferred or assigned by Lender, this Agreement shall inure to the benefit of Lender's transferee or assignee to the extent of such transfer or assignment, provided that Lender shall continue to have the unimpaired right to enforce this Agreement as to any of the Senior Debt not so transferred or assigned.

13)    _No Waiver_.  This Agreement shall not be affected, impaired, or released by the delay or failure of Lender to exercise any of its rights and remedies against any Debtor or under any of the Senior Loan Documents or against any collateral or security for the Senior Debt. No delay or failure on the part of Lender to exercise any of its rights or remedies hereunder or now or hereafter existing at law or in equity or by statute or otherwise, or any partial or single exercise thereof, shall constitute a waiver thereof. All such rights and remedies are cumulative and may be exercised singly or concurrently and the exercise of any one or more of them will not be a waiver of any other. No waiver of any of its rights and remedies hereunder and no modification or amendment of this Agreement shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights and remedies of Lender hereunder in any other respect at any other time.

14)    _Participations_.  Lender shall have the right to grant participations in the Senior Debt to others at any time and from time to time, and Lender may divulge to any such participant or potential participant all information, reports, financial statements, and documents obtained in connection with this Agreement, any of the Senior Loan Documents, or otherwise.

15)    _Severability_.  If any term of this Agreement or any obligation thereunder shall be held to be invalid, illegal, or unenforceable, the remainder of this Agreement and any other application of such term shall not be affected thereby.

16)    _Counterparts_.  This Agreement may be executed in duplicate originals or in several counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument, and it shall not be necessary in making proof hereof to produce or account for more than one such duplicate, original, or counterpart.

17)    *Binding Agreement*.  This Agreement shall be binding upon the heirs, personal representatives, successors, and assigns of Subordinating Creditor and shall inure to the benefit of the successors and assigns of Lender.

18)    *Miscellaneous*.  As used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders, as the context may require, and the term "person" shall include an individual, a corporation, an association, a partnership, a limited liability company, a trust, an organization or any other legal entity. The paragraph headings of this Agreement are for convenience only and shall not limit or otherwise affect any of the terms hereof.

19)    *Governing Law*.  This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland and shall be deemed to be executed, delivered, and accepted in the State of Maryland.

20)    *JURY TRIAL WAIVER*.  LENDER AND SUBORDINATING CREDITOR JOINTLY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH LENDER AND SUBORDINATING CREDITOR MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY SUBORDINATING CREDITOR, AND SUBORDINATING CREDITOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. SUBORDINATING CREDITOR FURTHER REPRESENTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Subordinating Creditor has caused this Agreement to be signed, sealed, and delivered on the day and year first written above.

WITNESS/ATTEST:                               **SUBORDINATING CREDITOR**:

PMCDTESSE, LLC
a Maryland limited liability company

By:  _____ (SEAL)
      Name:  Peter McDermott
      Title:   Sole Member


**Acknowledgments**

STATE _____ OF _COLORADO_ , CITY/COUNTY OF _DENVER_ , TO WIT:

I HEREBY CERTIFY that on this ____ day of April, 2018, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Peter McDermott, and acknowledged himself to be the sole member of PMcDTesse, LLC, a Maryland limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

_12-26-2018_

CHERYL SIMON-MEQUET
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20064051182
MY COMMISSION EXPIRES DECEMBER 26, 2018

6

4846-8154-0449, v. 1

Borrower joins in the execution of this Agreement so as to signify Borrower's acceptance of and consent to the provisions of this Agreement.

WITNESS/ATTEST:                          **BORROWER**:

TESSEMAE'S LLC
A Maryland Limited Liability Company

By: _____ (SEAL)
Gregory Vetter
Manager and Chief Executive Officer

STATE OF MARYLAND, CITY/COUNTY OF _Harford_, TO WIT:

I HEREBY CERTIFY that on this _5_ day of April, 2018, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Gregory Vetter, and acknowledged himself to be a Manager and the Chief Executive Officer of TESSEMAE'S LLC, a Maryland limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing document for the purposes therein contained, in the aforementioned capacity.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:

_1-26-2020_

TAYLER LANE PICKLE
Notary Public
Harford County
Maryland
My Commission Expires Jan. 26, 2020

7

**CIRCUIT COURT FOR BALTIMORE CITY**

**MARYLAND**

CIVIL DIVISION

111 N. Calvert Street

Baltimore, Maryland 21202

Civil: 410-333-3722
Criminal: 410-333-3750
Family: 410-333-3709/3738
Juvenile: 443-263-6300

**To:** ROBERT MCDERMOTT, JR.
4455 SOUTH HOLLY STREET
CHERRY HILLS, CO 80111

| | |
|---|---|
| **Case Number:** | C-24-CV-25-003179 |
| **Other Reference Number(s):** | |
| **Child Support Enforcement Number:** | |

**DEMOCRACY CAPITAL CORPORATION VS. ROBERT MCDERMOTT, JR., ET AL.**

Issue Date: 4/24/2025

## WRIT OF SUMMONS

You are summoned to file a written response by pleading or motion, within 60 days after service of this summons upon you, in this court, to the attached complaint filed by:

DEMOCRACY CAPITAL CORPORATION

4800 Montgomery Lane, 10th Floor

Bethesda, MD 20814

This summons is effective for service only if served within 60 days after the date it is issued.

*Xavier Conaway*

Xavier A. Conaway

Clerk of the Circuit Court

To the person summoned:

Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.

Personal attendance in court on the day named is NOT required.

It is your responsibility to ensure that the court has your current and correct mailing address in order to receive subsequent filings and notice in this case.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued. If it is not served within the 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.
4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

**Democracy Capital Corporation vs. Robert McDermott, Jr., et al.**

**Circuit Court for Baltimore City**
**Case Number: C-24-CV-25-003179**

## SHERIFF'S RETURN
### (please print)

To:  ROBERT MCDERMOTT, JR.

_____ ID# _____ of the _____
        Serving Sheriff's Name

County Sheriff's office present to the court that I:

(1) Served   _____
                              Name of person served

on _____ at _____
        Date of service                          Location of service

_____ by _____ with the following:
                                         Manner of service

☐ Summons                              ☐ Counter-Complaint

☐ Complaint                            ☐ Domestic Case Information Report

☐ Motions      _____        ☐ Financial Statement

☐ Petition and Show Cause Order        ☐ Interrogatories

☐ Other   _____
                      Please specify

(2) Was unable to serve because:

☐ Moved left no forwarding address     ☐ No such address

☐ Address not in jurisdiction          ☐ Other _____
                                                      Please specify

Sheriff fee: $ _____   ☐ waived by _____

_____   _____
        Date                    Signature of serving Sheriff

Instructions to Sheriff's Office or Private Process Server:

1.  This Summons is effective for service only if served within 60 days after the date issued. If it is not served within 60 days, the plaintiff must send a written request to have it renewed.
2.  Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3.  Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.
4.  If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).

**CIRCUIT COURT FOR BALTIMORE CITY**
**MARYLAND**
CIVIL DIVISION
111 N. Calvert Street
Baltimore, Maryland 21202

Civil: 410-333-3722
Criminal: 410-333-3750
Family: 410-333-3709/3738
Juvenile: 443-263-6300

**To:** MCDJR-TESSE, LLC
7 SAINT PAUL STREET
BALTIMORE, MD 21202

| | |
|---|---|
| **Case Number:** | C-24-CV-25-003179 |
| **Other Reference Number(s):** | |
| **Child Support Enforcement Number:** | |

**DEMOCRACY CAPITAL CORPORATION VS. ROBERT MCDERMOTT, JR., ET AL.**

Issue Date: 4/24/2025

## WRIT OF SUMMONS

You are summoned to file a written response by pleading or motion, within 30 days after service of this summons upon you, in this court, to the attached complaint filed by:

DEMOCRACY CAPITAL CORPORATION
4800 Montgomery Lane, 10th Floor
Bethesda, MD  20814

This summons is effective for service only if served within 60 days after the date it is issued.

Xavier A. Conaway
Clerk of the Circuit Court

To the person summoned:
Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.
Personal attendance in court on the day named is NOT required.
It is your responsibility to ensure that the court has your current and correct mailing address in order to receive subsequent filings and notice in this case.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued. If it is not served within the 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.
4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

**Democracy Capital Corporation vs. Robert McDermott, Jr., et al.**     **Circuit Court for Baltimore City**
                                                                         **Case Number: C-24-CV-25-003179**

## SHERIFF'S RETURN
### (please print)

To: MCDJR-TESSE, LLC

_____ ID# _____ of the _____
      Serving Sheriff's Name

County Sheriff's office present to the court that I:

(1) Served _____
                          Name of person served

on _____ at _____
      Date of service                     Location of service

_____ by _____ with the following:
                            Manner of service

- ☐ Summons
- ☐ Complaint
- ☐ Motions
- ☐ Petition and Show Cause Order
- ☐ Other _____
                Please specify

- ☐ Counter-Complaint
- ☐ Domestic Case Information Report
- ☐ Financial Statement
- ☐ Interrogatories

(2) Was unable to serve because:
- ☐ Moved left no forwarding address
- ☐ Address not in jurisdiction
- ☐ No such address
- ☐ Other _____
                Please specify

Sheriff fee: $ _____ ☐ waived by _____

_____ _____
      Date                  Signature of serving Sheriff

Instructions to Sheriff's Office or Private Process Server:
1. This Summons is effective for service only if served within 60 days after the date issued. If it is not served within 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.
4. If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).

**CIRCUIT COURT FOR BALTIMORE**
**MARYLAND**
CIVIL DIVISION
111 N. Calvert Street
Baltimore, Maryland 21202

Civil: 410-333-3722
Criminal: 410-333-3750
Family: 410-333-3709/3738
Juvenile: 443-263-6300

**To:** PETER MCDERMOTT
1 POND DRIVE
ENGLEWOOD, CO 80113

| | |
|---|---|
| **Case Number:** | C-24-CV-25-003179 |
| **Other Reference Number(s):** | |
| **Child Support Enforcement Number:** | |

**DEMOCRACY CAPITAL CORPORATION VS. ROBERT MCDERMOTT, JR., ET AL.**

Issue Date: 4/24/2025

## WRIT OF SUMMONS

You are summoned to file a written response by pleading or motion, within 60 days after service of this summons upon you, in this court, to the attached complaint filed by:

DEMOCRACY CAPITAL CORPORATION
4800 Montgomery Lane, 10th Floor
Bethesda, MD 20814

This summons is effective for service only if served within 60 days after the date it is issued.

*Xavier A. Conaway*

Xavier A. Conaway
Clerk of the Circuit Court

To the person summoned:
Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.
Personal attendance in court on the day named is NOT required.
It is your responsibility to ensure that the court has your current and correct mailing address in order to receive subsequent filings and notice in this case.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued. If it is not served within the 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.
4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

**Circuit Court for Baltimore City**

**Democracy Capital Corporation vs. Robert McDermott, Jr., et al.**    **Case Number: C-24-CV-25-003179**

## SHERIFF'S RETURN
### (please print)

To:  PETER MCDERMOTT

_____ ID# _____ of the _____

Serving Sheriff's Name

County Sheriff's office present to the court that I:

(1) Served _____

Name of person served

on _____ at _____

Date of service        Location of service

_____ by _____ with the following:

Manner of service

- [ ] Summons
- [ ] Complaint
- [ ] Motions
- [ ] Petition and Show Cause Order
- [ ] Other _____

Please specify

- [ ] Counter-Complaint
- [ ] Domestic Case Information Report
- [ ] Financial Statement
- [ ] Interrogatories

(2) Was unable to serve because:

- [ ] Moved left no forwarding address
- [ ] Address not in jurisdiction

- [ ] No such address
- [ ] Other _____

Please specify

Sheriff fee: $ _____    [ ] waived by _____

_____    _____

Date        Signature of serving Sheriff

Instructions to Sheriff's Office or Private Process Server:

1. This Summons is effective for service only if served within 60 days after the date issued. If it is not served within 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.
4. If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).

**CIRCUIT COURT FOR BALTIMORE CITY**

**MARYLAND**

CIVIL DIVISION

111 N. Calvert Street

Baltimore, Maryland 21202

Civil: 410-333-3722
Criminal: 410-333-3750
Family: 410-333-3709/3738
Juvenile: 443-263-6300

**To:** PMCDTESSE, LLC
7 SAINT PAUL STREET
BALTIMORE, MD 21202

| | |
|---|---|
| Case Number: | C-24-CV-25-003179 |
| Other Reference Number(s): | |
| Child Support Enforcement Number: | |

**DEMOCRACY CAPITAL CORPORATION VS. ROBERT MCDERMOTT, JR., ET AL.**

Issue Date: 4/24/2025

## WRIT OF SUMMONS

You are summoned to file a written response by pleading or motion, within 30 days after service of this summons upon you, in this court, to the attached complaint filed by:

DEMOCRACY CAPITAL CORPORATION

4800 Montgomery Lane, 10th Floor

Bethesda, MD 20814

This summons is effective for service only if served within 60 days after the date it is issued.

*Xavier A. Conaway*

Xavier A. Conaway
Clerk of the Circuit Court

To the person summoned:

Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.

Personal attendance in court on the day named is NOT required.

It is your responsibility to ensure that the court has your current and correct mailing address in order to receive subsequent filings and notice in this case.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued. If it is not served within the 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.
4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

**Democracy Capital Corporation vs. Robert McDermott, Jr., et al.**

**Circuit Court for Baltimore City**
**Case Number: C-24-CV-25-003179**

## SHERIFF'S RETURN
### (please print)

To:  PMCDTESSE, LLC

_____  ID# _____  of the _____
Serving Sheriff's Name

County Sheriff's office present to the court that I:

(1) Served _____
Name of person served

on _____  at _____
Date of service                                              Location of service

_____  by _____  with the following:
Manner of service

☐ Summons                                     ☐ Counter-Complaint

☐ Complaint                                    ☐ Domestic Case Information Report

☐ Motions   _____       ☐ Financial Statement

☐ Petition and Show Cause Order       ☐ Interrogatories

☐ Other _____
Please specify

(2) Was unable to serve because:

☐ Moved left no forwarding address     ☐ No such address

☐ Address not in jurisdiction               ☐ Other _____
Please specify

Sheriff fee: $ _____  ☐ waived by _____

_____        _____
Date                                       Signature of serving Sheriff

Instructions to Sheriff's Office or Private Process Server:

1. This Summons is effective for service only if served within 60 days after the date issued. If it is not served within 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.
4. If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).

IN THE CIRCUIT COURT FOR <u>Baltimore City</u>

(City/County)

## CIVIL – NON-DOMESTIC CASE INFORMATION SHEET

### DIRECTIONS

*Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Justice of the Supreme Court of Maryland pursuant to Rule 2-111(a).

*Defendant:* You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

**FORM FILED BY:** ☒ PLAINTIFF  ☐ DEFENDANT          CASE NUMBER _____

(Clerk to insert)

**CASE NAME:** <u>Democracy Capital Corporation</u>          vs.          <u>Robert F. McDermott, Jr.</u>

Plaintiff                                        Defendant

**PARTY'S NAME:** <u>Democracy Capital Corporation</u>          PHONE: _____

**PARTY'S ADDRESS:** <u>4800 Montgomery Lane, 10th Floor, Bethesda, MD 20814</u>

**PARTY'S E-MAIL:** _____

**If represented by an attorney:**

**PARTY'S ATTORNEY'S NAME:** <u>James T. Heidelbach</u>          PHONE: <u>410-752-5830</u>

**PARTY'S ATTORNEY'S ADDRESS:** <u>Gebhardt & Smith LLP, One South St., Suite 2200, Baltimore, MD 21202</u>

**PARTY'S ATTORNEY'S E-MAIL:** <u>jheid@gebsmith.com</u>

**JURY DEMAND?** ☐ Yes  ☒ No

**RELATED CASE PENDING?** ☐ Yes  ☒ No  If yes, Case #(s), if known: _____

**ANTICIPATED LENGTH OF TRIAL?:** _____ hours  <u>3</u>  days

### PLEADING TYPE

**New Case:** ☒ Original   ☐ Administrative Appeal   ☐ Appeal
**Existing Case:** ☐ Post-Judgment   ☐ Amendment
*If filing in an existing case,* skip Case Category/ Subcategory section – go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (Check one box.)

**TORTS**
☐ Asbestos
☐ Assault and Battery
☐ Business and Commercial
☐ Conspiracy
☐ Conversion
☐ Defamation
☐ False Arrest/Imprisonment
☐ Fraud
☐ Lead Paint – DOB of Youngest Plt:
☐ Loss of Consortium
☐ Malicious Prosecution
☐ Malpractice-Medical
☐ Malpractice-Professional
☐ Misrepresentation
☐ Motor Tort
☐ Negligence
☐ Nuisance
☐ Premises Liability
☐ Product Liability
☐ Specific Performance
☐ Toxic Tort
☐ Trespass
☐ Wrongful Death

**CONTRACT**
☐ Asbestos
☐ Breach
☒ Business and Commercial
☐ Confessed Judgment (Cont'd)
☐ Construction
☐ Debt
☐ Fraud

**Government**
☐ Government
☐ Insurance
☐ Product Liability

**PROPERTY**
☐ Adverse Possession
☐ Breach of Lease
☐ Detinue
☐ Distress/Distrain
☐ Ejectment
☐ Forcible Entry/Detainer
☐ Foreclosure
  ☐ Commercial
  ☐ Residential
  ☐ Currency or Vehicle
  ☐ Deed of Trust
  ☐ Land Installments
  ☐ Lien
  ☐ Mortgage
  ☐ Right of Redemption
  ☐ Statement Condo
☐ Forfeiture of Property / Personal Item
☐ Fraudulent Conveyance
☐ Landlord-Tenant
☐ Lis Pendens
☐ Mechanic's Lien
☐ Ownership
☐ Partition/Sale in Lieu
☐ Quiet Title
☐ Rent Escrow
☐ Return of Seized Property
☐ Right of Redemption
☐ Tenant Holding Over

**PUBLIC LAW**
☐ Attorney Grievance
☐ Bond Forfeiture Remission
☐ Civil Rights
☐ County/Mncpl Code/Ord
☐ Election Law
☐ Eminent Domain/Condemn.
☐ Environment
☐ Error Coram Nobis
☐ Habeas Corpus
☐ Mandamus
☐ Prisoner Rights
☐ Public Info. Act Records
☐ Quarantine/Isolation
☐ Writ of Certiorari

**EMPLOYMENT**
☐ ADA
☐ Conspiracy
☐ EEO/HR
☐ FLSA
☐ FMLA
☐ Worker's Compensation
☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
☐ Assumption of Jurisdiction
☐ Authorized Sale
☐ Attorney Appointment
☐ Body Attachment Issuance
☐ Commission Issuance

☐ Constructive Trust
☐ Contempt
☐ Deposition Notice
☐ Dist Ct Mtn Appeal
☐ Financial
☐ Grand Jury/Petit Jury
☐ Miscellaneous
☐ Perpetuate Testimony/Evidence
☐ Prod. of Documents Req.
☐ Receivership
☐ Sentence Transfer
☐ Set Aside Deed
☐ Special Adm. – Atty
☐ Subpoena Issue/Quash
☐ Trust Established
☐ Trustee Substitution/Removal
☐ Witness Appearance-Compel

**PEACE ORDER**
☐ Peace Order

**EQUITY**
☐ Declaratory Judgment
☐ Equitable Relief
☐ Injunctive Relief
☐ Mandamus

**OTHER**
☐ Accounting
☐ Friendly Suit
☐ Grantor in Possession
☐ Maryland Insurance Administration
☐ Miscellaneous
☐ Specific Transaction
☐ Structured Settlements

**CC-DCM-002** (Rev. 12/2022)          Page 1 of 3

| IF NEW OR EXISTING CASE: RELIEF (Check All that Apply) |
|---|

| | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Default | ☐ Reinstatement of Employment |
| ☐ Administrative Action | ☐ Enrollment | ☐ Judgment-Interest | ☐ Return of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Arbitration | ☐ Financial Exploitation | ☐ Liability | ☐ Specific Performance |
| ☐ Asset Determination | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Attachment b/f Judgment | ☐ Foreclosure | ☐ Order | ☐ Writ-Execution |
| ☐ Cease & Desist Order | ☐ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Condemn Bldg | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Contempt | ☐ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☐ Court Costs/Fees | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☒ Damages-Compensatory | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☐ Damages-Punitive | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |

*If you indicated **Liability** above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.     ☐ Liability is not conceded, but is not seriously in dispute.     ☐ Liability is seriously in dispute.

| MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs) |
|---|

☐ Under $10,000          ☐ $10,000 - $30,000          ☐ $30,000 - $100,000          ☒ Over $100,000

☐ Medical Bills $ _____     ☐ Wage Loss $ _____     ☐ Property Damages $ _____

| ALTERNATIVE DISPUTE RESOLUTION INFORMATION |
|---|

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

| | | | |
|---|---|---|---|
| A. Mediation | ☐ Yes ☒ No | C. Settlement Conference | ☐ Yes ☒ No |
| B. Arbitration | ☐ Yes ☒ No | D. Neutral Evaluation | ☐ Yes ☒ No |

| SPECIAL REQUIREMENTS |
|---|

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

| ESTIMATED LENGTH OF TRIAL |
|---|

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*

*(Case will be tracked accordingly)*

☐ 1/2 day of trial or less          ☐ 3 days of trial time

☐ 1 day of trial time          ☐ More than 3 days of trial time

☐ 2 days of trial time

| BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM |
|---|

***For all jurisdictions,*** *if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited** - Trial within 7 months of          ☒ **Standard** - Trial within 18 months of

Defendant's response          Defendant's response

EMERGENCY RELIEF REQUESTED

**COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)**

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of Defendant's response

☐ **Standard** - Trial within 18 months of Defendant's response

***IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.***

**CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)**

| | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Civil-Short | Trial 210 days from first answer. |
| ☐ Civil-Standard | Trial 360 days from first answer. |
| ☒ Custom | Scheduling order entered by individual judge. |
| ☐ Asbestos | Special scheduling order. |
| ☐ Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ Tax Sale Foreclosures | Special scheduling order. |
| ☐ Mortgage Foreclosures | No scheduling order. |

**CIRCUIT COURT FOR BALTIMORE COUNTY**

| | | |
|---|---|---|
| ☐ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

April 23, 2024
_____
Date

Gebhardt & Smith, LLP, One South St., Suite 2200
_____
Address

Baltimore         MD         21211
_____
City        State        Zip Code

_____        8512010265
Signature of Attorney / Party        Attorney Number

James T. Heidelbach
_____
Printed Name

**CC-DCM-002** (Rev. 12/2022)          Page 3 of 3

DEMOCRACY CAPITAL CORPORATION　　*　IN THE
4800 Montgomery Lane, 10th Floor
Bethesda, Maryland 20814　　　　　　　*　CIRCUIT COURT

　　　　Plaintiff,　　　　　　　　　　*　FOR

v.　　　　　　　　　　　　　　　　*　BALTIMORE CITY

ROBERT F. MCDERMOTT, JR.　　　　　*　　　　C-24-CV-25-003179
4455 South Holly Street　　　　　　　　　Case No. _____
Cherry Hills Village, Colorado 80111　　　*

And　　　　　　　　　　　　　　　*

MCDJR-TESSE, LLC　　　　　　　　*
7 St. Paul Street
Baltimore, Maryland 21202　　　　　　　*

And　　　　　　　　　　　　　　　*

PETER MCDERMOTT　　　　　　　*
1 Pond Drive
Englewood, Colorado 80113　　　　　　*

And　　　　　　　　　　　　　　　*

PMCDTESSE, LLC　　　　　　　　*
7 St. Paul Street
Baltimore, Maryland 21202　　　　　　　*

　　　　Defendants.　　　　　　　*

*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

## COMPLAINT

Plaintiff, Democracy Capital Corporation, by its undersigned attorneys, hereby sues Defendants, Robert J. McDermott, Jr., MCDJR-TESSE, LLC, Peter McDermott, and PMCDTESSE, LLC, and for its causes of action states as follows:

### Nature of Action

1.　　This lawsuit concerns loans and other credit accommodations the Plaintiff and the Defendants each extended to Tessemae's LLC ("**Tessemae's**"), a Maryland limited liability

company that was engaged in the business of selling salad dressing, marinades, condiments, salad kits and grab to-go food items.

2.      The Defendants contractually agreed with the Plaintiff and Tessemae's to subordinate the loans and credit accommodations they extended to Tessemae's to the loans and credit accommodations Democracy extended to Tessemae's.

3.      The Defendants breached their contractual obligations to Democracy, and engaged in other tortious conduct by, among other things, accepting payments from Tessemae's they were not permitted to accept, modifying the terms of the indebtedness owed to them by Tessemae's without Democracy's knowledge or consent, and extending new credit to Tessemae's that they were not permitted to extend.

4.      Because of the Defendants' improper actions, the Defendants received several million dollars in payments from Tessemae's in connection with their subordinated indebtedness that should have been paid to Democracy as the senior lender.

**Parties**

5.      Plaintiff, Democracy Capital Corporation ("**Democracy**" or "**Plaintiff**"), is a Delaware corporation with its principal place of business located at 4800 Montgomery Lane, 10th Floor, Bethesda, Maryland 20814.

6.      Defendant, Robert McDermott, Jr., ("**Robert McDermott**"), is a resident of the State of Colorado who resides at 4455 South Holly Street, Cherry Hills Village, Colorado 80111.

7.      Defendant, MCDJR-TESSE, LLC ("**MCDJR**"), is a Maryland limited liability company with its principal place of business located at 7 St. Paul Street, Baltimore, Maryland 21202.  Upon information and belief, MCDJR is a special purpose entity that was formed by Robert

2

McDermott for the sole purpose of extending loans and credit accommodations to Tessemae's. Upon information and belief, Robert McDermott is the sole member and owner of MCDJR.

8.      Defendant, Peter McDermott, is a resident of the State of Colorado who resides at 1 Pond Drive, Englewood, Colorado 80113.

9.      Defendant, PMCDTESSE, LLC ("**PMCD**"), is a Maryland limited liability company with its principal place of business located at 7 St. Paul Street, Baltimore, Maryland 21202.  Upon information and belief, PMCD is a special purpose entity that was formed by Peter McDermott for the sole purpose of extending loans and credit accommodations to Tessemae's. Upon information and belief, Robert McDermott is the sole member and owner of MCDJR.

**Jurisdiction and Venue**

10.      Jurisdiction is proper in this Court pursuant to Sections 6-102 and 6-103 of the Courts and Judicial Proceedings Article of the *Annotated Code of Maryland* because the corporate Defendants are domiciled in, organized under and maintain their principal place of business in the State of Maryland and because the Plaintiff's cause of action against the Defendants is based upon contracts executed in and governed by the laws of the State of Maryland and actions taken by the Defendants in the State of Maryland.

11.      Venue is proper in this Court pursuant to Sections 6-201 and 6-202 of the Courts and Judicial Proceedings Article of the *Annotated Code of Maryland* because the corporate Defendants maintain their principal place of business and/or regularly conduct business in Baltimore City and the individual Defendants are non-residents who can be sued in any county in the State of Maryland.

### Tessemae's

12.     Tessemae's was founded in Maryland in 2009 and grew rapidly. Within a few years, its products were being distributed and sold in supermarkets and large grocery chains throughout the country.

13.     To finance its rapid expansion, Tessemae's obtained loans and equity investments from various sources.  However, by early 2018, Tessemae's was experiencing cash flow difficulties and was in default on its obligations to various creditors, many of whom had commenced collection actions against Tessemae's.

14.     Tessemae's defaulted obligations included certain loans Tessemae's had previously obtained from Howard Bank that were secured by a first lien on all Tessemae's assets (collectively, the "**Howard Bank Loans**").

15.     In early 2018, after unsuccessfully attempting to refinance the Howard Bank Loans with another lender, Tessemae's approached Democracy with a proposal that Democracy acquire and restructure the Howard Bank Loans.

### The Democracy Loan

16.     On April 10, 2018, Democracy acquired, restructured and consolidated the Howard Bank Loans into a single loan (the "**Democracy Loan**") that was evidenced by a Consolidated, Amended and Restated Promissory Note in the original principal amount of $3,000,000.00 (the "**Democracy Note**") and various other documents executed and delivered by Tessemae's and others for the benefit of Democracy (together with the Democracy Note, the "**Democracy Loan Documents**").

17.     Under the terms of the Democracy Loan Documents, Tessemae's was required to pay in cash on a monthly basis a portion of the interest accruing on the outstanding principal

4

balance of the Democracy Loan with the balance of the interest deferred at Tessemae's election and payable at maturity together with the entire principal balance and an "exit fee" equal to $7,500,000.00 (the "**Exit Fee**").  In lieu of paying the Exit Fee, Tessemae's could tender to Democracy a "warrant" that would provide for a payment to Democracy in the minimum amount of $7,500,000.00 in the event of a sale, merger, consolidation, reorganization or other capital event of Tessemae's or liquidation of its assets (the "**Warrant**").

18.    In connection with the Democracy Loan, and as an express condition to extending credit, Democracy required that various creditors of Tessemae's subordinate any existing and future indebtedness owed to them by Tessemae's to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan. Those creditors included Defendants, Robert McDermott, MCDJR, Peter McDermott and PMCD.

## The Robert McDermott Subordination Agreement

19.    Pursuant to a Subordination Agreement dated as of April 10, 2018 by and among Robert McDermott, Democracy and Tessemae's (the "**Robert McDermott Subordination Agreement**"), Robert McDermott agreed to subordinate any existing and future indebtedness owed to him by Tessemae's, directly or indirectly, to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan, which was specifically referenced in the Robert McDermott Subordination Agreement.  A true and accurate copy of the Robert McDermott Subordination Agreement is attached hereto as **Exhibit A**.

20.    In the Robert McDermott Subordination Agreement, Robert McDermott represented that he had outstanding loans to Tessemae's in the principal amounts of $200,000.00 and $500,000.00 (collectively, the "**Original Robert McDermott Loans**").  Robert McDermott

agreed that all indebtedness owed to him by Tessemae's, including the indebtedness owed under the Original Robert McDermott Loans (the "**Subordinated Robert McDermott Indebtedness**"), would be subordinate in all respects to the indebtedness owed by Tessemae's to Democracy under the Democracy Loan, and to any other indebtedness owed to Democracy by Tessemae's (the "**Senior Democracy Indebtedness**").

21.    Except for regularly scheduled interest payments approved in advance by Democracy and received at a time when the Democracy Loan was not in default ("**Permitted Payments**"), Robert McDermott was prohibited under the Robert McDermott Subordination Agreement from receiving or retaining any payments with respect to the Subordinated Robert McDermott Indebtedness.

22.    The Robert McDermott Subordination Agreement further provided that, in the event Robert McDermott received or was entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated Robert McDermott Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness.

23.    Robert McDermott was required to hold any prohibited payments that he received with respect to the Subordinated Robert McDermott Indebtedness "in trust" for Democracy's benefit and to promptly deliver the payments to Democracy in precisely the same form in which he received them.

24.    By entering into the Robert McDermott Subordination Agreement, Robert McDermott knowingly and willfully assumed the role of a trustee and fiduciary with respect to any payments that he might receive with respect to the Subordinated Robert McDermott

Indebtedness that he was not permitted to retain under the terms of the Robert McDermott Subordination Agreement.

25.    In connection with his entry into the Robert McDermott Subordination Agreement, the promissory notes evidencing the Original Robert McDermott Loans were amended and restated pursuant to Amended and Restated Promissory Notes each dated April 10, 2018 (collectively, as amended, the "**Original Robert McDermott Loan Notes**").  In the Original Robert McDermott Loan Notes, Robert McDermott expressly acknowledged and agreed that Tessemae's obligations to him under the Original Robert McDermott Loans were subordinate to Tessemae's obligations to Democracy under the Democracy Loan.

26.    In the Robert McDermott Subordination Agreement, Robert McDermott expressly agreed that the Original Robert McDermott Loan Notes would not be modified and that the principal amount of the Subordinated Robert McDermott Indebtedness would not exceed $700,000.00 without Democracy's prior written consent.

## The MCDJR Subordination Agreement

27.    Pursuant to a Subordination Agreement dated as of April 10, 2018 by and among MCDJR, Democracy and Tessemae's (the "**MCDJR Subordination Agreement**"), MCDJR agreed to subordinate any existing and future indebtedness owed to it by Tessemae's, directly or indirectly, to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan, which was specifically referenced in the MCDJR Subordination Agreement. A true and accurate copy of the MCDJR Subordination Agreement is attached hereto as **Exhibit B**.

28.    In the MCDJR Subordination Agreement, MCDJR represented that it had an outstanding loan to Tessemae's in the principal amount of $350,000.00 (the "**Original MCDJR**

**Loan**").  MCDJR agreed that all indebtedness owed to it by Tessemae's, including the indebtedness owed under the Original MCDJR Loan (the "**Subordinated MCDJR Indebtedness**"), would be subordinate in all respects to the Senior Democracy Indebtedness.

29.     Except for Permitted Payments (as defined above), MCDJR was prohibited under the MCDJR Subordination Agreement from receiving or retaining any payments with respect to the Subordinated MCDJR Indebtedness

30.     The MCDJR Subordination Agreement further provided that, in the event MCDJR received or was entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated MCDJR Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness.

31.     MCDJR was required to hold any prohibited payments that it received with respect to the Subordinated MCDJR Indebtedness "in trust" for Democracy's benefit and to promptly deliver the payments to Democracy in precisely the same form in which it received them.

32.     By entering into the MCDJR Subordination Agreement, MCDJR knowingly and willfully assumed the role of a trustee and fiduciary with respect to any payments that it might receive with respect to the Subordinated MCDJR Indebtedness that it was not permitted to retain under the terms of the MCDJR Subordination Agreement.

33.     The Original MCDJR Loan was extended to Tessemae's at the same time and in conjunction with the extension of the Democracy Loan.  The Original MCDJR Loan is evidenced by a Promissory Note dated April 9, 2018 (the "**Original MCDJR Loan Note**").  In the Original MCDJR Loan Note, MCDJR expressly acknowledged and agreed that Tessemae's obligations to

MCDJR under the Original MCDJR Loan were subordinate to Tessemae's obligations to Democracy under the Democracy Loan.

34.    In the MCDJR Subordination Agreement, MCDJR expressly agreed that the Original MCDJR Loan Note would not be modified and that the principal amount of the Subordinated MCDJR Indebtedness would not exceed $350,000.00 without Democracy's prior written consent. MCDJR also agreed to notify Democracy of any default under the Subordinated MCDJR Indebtedness.

### The Peter McDermott Subordination Agreement

35.    Pursuant to a Subordination Agreement dated as of April 10, 2018 by and among Peter McDermott, Democracy and Tessemae's (the "**Peter McDermott Subordination Agreement**"), Peter McDermott agreed to subordinate any existing and future indebtedness owed to him by Tessemae's, directly or indirectly, to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan, which was specifically referenced in the Peter McDermott Subordination Agreement. A true and accurate copy of the Peter McDermott Subordination Agreement is attached hereto as **Exhibit C**.

36.    In the Peter McDermott Subordination Agreement, Peter McDermott represented that he had outstanding loans to Tessemae's in the principal amounts of $250,000.00 and $500,000.00 (collectively, the "**Original Peter McDermott Loans**"). Peter McDermott agreed that all indebtedness owed to him by Tessemae's, including the indebtedness owed under the Original Peter McDermott Loans (the "**Subordinated Peter McDermott Indebtedness**"), would be subordinate in all respects to the Senior Democracy Indebtedness.

9

37.    Except for Permitted Payments (as defined above), Peter McDermott was prohibited under the Peter McDermott Subordination Agreement from receiving or retaining any payments with respect to the Subordinated Peter McDermott Indebtedness.

38.    The Peter McDermott Subordination Agreement further provided that, in the event Peter McDermott received or was entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated Peter McDermott Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness.

39.    Peter McDermott was required to hold any prohibited payments that it received with respect to the Subordinated Peter McDermott Indebtedness "in trust" for Democracy's benefit and to promptly deliver the payments to Democracy in precisely the same form in which he received them.

40.    By entering into the Peter McDermott Subordination Agreement, Peter McDermott knowingly and willfully assumed the role of a trustee and fiduciary with respect to any payments that he might receive with respect to the Subordinated Peter McDermott Indebtedness that he was not permitted to retain under the terms of the Peter McDermott Subordination Agreement.

41.    In connection with his entry into the Peter McDermott Subordination Agreement, the promissory notes evidencing the Original Peter McDermott Loans were amended and restated pursuant to separate Amended and Restated Promissory Notes, each dated April 10, 2018 (collectively, as amended, the "**Original Peter McDermott Loan Notes**").  In the Original Peter McDermott Loan Notes, Peter McDermott expressly acknowledged and agreed that Tessemae's

obligations to him under the Original Peter McDermott Loans were subordinate to Tessemae's obligations to Democracy under the Democracy Loan.

42.     In the Peter McDermott Subordination Agreement, Peter McDermott expressly agreed that the Original Peter McDermott Loan Notes would not be modified and that the principal amount of the Subordinated Peter McDermott Indebtedness would not exceed $750,000.00 without Democracy's prior written consent.  Peter McDermott also agreed to notify Democracy of any default under the Subordinated Peter McDermott Indebtedness.

## The PMCD Subordination Agreement

43.     Pursuant to a Subordination Agreement dated as of April 10, 2018 by and among PMCD, Democracy and Tessemae's (the "**PMCD Subordination Agreement**"), PMCD agreed to subordinate any existing and future indebtedness owed to it by Tessemae's, directly or indirectly, to any existing and future indebtedness owed to Democracy by Tessemae's, including the indebtedness associated with the Democracy Loan, which was specifically referenced in the PMCD Subordination Agreement. A true and accurate copy of the PMCD Subordination Agreement is attached hereto as **Exhibit D**.

44.     In the PMCD Subordination Agreement, PMCD represented that it had an outstanding loan to Tessemae's in the principal amount of $300,000.00 (the "**Original PMCD Loan**").  PMCD agreed that all indebtedness owed to it by Tessemae's, including the indebtedness owed under the Original PMCD Loan (the "**Subordinated PMCD Indebtedness**"), would be subordinate in all respects to the Senior Democracy Indebtedness.

45.     Except for Permitted Payments (as defined above), PMCD was prohibited under the PMCD Subordination Agreement from receiving or retaining any payments with respect to the Subordinated PMCD Indebtedness.

46.     The PMCD Subordination Agreement further provided that, in the event PMCD received or was entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated PMCD Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness.

47.     PMCD was required to hold any prohibited payments that it received with respect to the Subordinated PMCD Indebtedness "in trust" for Democracy's benefit and to promptly deliver the payments to Democracy in precisely the same form in which it received them.

48.     By entering into the PMCD Subordination Agreement, PMCD knowingly and willfully assumed the role of a trustee and fiduciary with respect to any payments that it might receive from Tessemae's with respect to the Subordinated PMCD Indebtedness that it was not permitted to retain under the terms of the PMCD Subordination Agreement.

49.     The PMCD Loan was extended to Tessemae's at the same time and in conjunction with the extension of the Democracy Loan.  The PMCD Loan is evidenced by a Promissory Note dated April 10, 2018 (the "**Original PMCD Loan Note**").  In the PMCD Loan Note, PMCD expressly acknowledged and agreed that Tessemae's obligations to PMCD under the Original PMCD Loan were subordinate to Tessemae's obligations to Democracy under the Democracy Loan.

50.     In the PMCD Subordination Agreement, PMCD expressly agreed that the Original PMCD Loan Note would not be modified and that the principal amount of the Subordinated PMCD Indebtedness would not exceed $300,000.00 without Democracy's prior written consent.  PMCD also agreed to notify Democracy of any default under the Subordinated PMCD Indebtedness.

**Tessemae's Default on the Democracy Loan**

51.    From the inception of the Democracy Loan, Tessemae's failed to tender to Democracy the full amount of the monthly interest payments that it was required to make under the terms of the Democracy Loan Documents. In addition, Tessemae's failed to provide Democracy with various financial information that it was required to provide to Democracy.

52.    Due to Tessemae's various defaults under the Democracy Loan Documents, Democracy invoked its right to assess default interest on the Democracy Loan commencing on July 1, 2019.

53.    On February 21, 2020, Democracy accelerated and demanded payments in full of the Democracy Loan.

54.    The Democracy Loan matured by its terms on April 10, 2020.

55.    Tessemae's failed to repay the Democracy Loan or satisfy its related obligations to Democracy, including payment of the Exit Fee or tender of a conforming Warrant.

56.    On November 11, 2020, Democracy filed suit against Tessemae's and certain guarantors of the Democracy Loan, Gregory and Genevieve Vetters (collectively, the "**Vetters**"), in the Circuit Court for Baltimore County, Case C-03-CV-20-004048 (the "**Baltimore County Case**"), to collect the sums that were then owed to Democracy under the Democracy Loan.

57.    After protracted litigation in the Baltimore County Case, Democracy obtained a final judgment against Tessemae's and the Vetters on January 25, 2024, in the principal amount of $8,706,250.00 (the "**Baltimore County Judgment**").

58.    On February 1, 2023, Tessemae's filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland, Case No. 23-10675 (the "**Bankruptcy Case**").

59.     Democracy filed a claim in the Bankruptcy Case for the sums owed to it in connection with the Democracy Loan.

60.     After protracted litigation, the Bankruptcy Case was resolved in the Summer of 2024 by approval of a plan of reorganization (the "**Approved Bankruptcy Plan**") that, among other things, granted Democracy an allowed claim against Tessemae's in the amount of $16,233,760.77 (the "**Allowed Bankruptcy Claim**").

61.     Although Democracy has received certain payments from Tessemae's and the Vetters in connection with their obligations to Democracy under the Baltimore County Judgment, the Approved Bankruptcy Plan and the Allowed Bankruptcy Claim, a substantial portion of the indebtedness owed to Democracy in connection with the Democracy Loan remains outstanding and unpaid.  As of the date of this Complaint, the amount of that unpaid indebtedness exceeds $10,000,000.00.

### Improper McDermott Pre-Bankruptcy Loans, Loan Modifications and Loan Payments

62.     Democracy has recently learned that, between 2019 and 2022, the Defendants breached their obligations under their respective Subordination Agreements (collectively, the "**McDermott Subordination Agreements**") by, among other things, accepting payments from Tessemae's with respect to the Subordinated Indebtedness as defined in the McDermott Subordination Agreements (the "**Subordinated McDermott Indebtedness**"), modifying the terms of the Subordinated McDermott Indebtedness without Democracy's knowledge or consent, extending new loans and credit accommodations to Tessemae's that they were not permitted to extend, and failing to notify Democracy of various defaults by Tessemae's under the Subordinated McDermott Indebtedness.

14

63.     On or about July 31, 2019, MCDJR extended a new loan to Tessemae's in the principal amount of $110,000.00 (the "**2019 MCDJR Loan**").  The MCDJR Loan was evidenced by a Promissory Note dated July 31, 2019 executed by Tessemae's for the benefit of MCDJR (the "**2019 MCDJR Loan Note**").  Tessemae's was required under the 2019 MCDJR Loan Note to make monthly payments of interest to MCDJR at the rate of 13.5 percent per annum. Although the 2019 MCDJR Loan was made in the name of MCDJR, the loan proceeds were advanced to Tessemae's by Robert McDermott and all payments that Tessemae's made under the 2019 MCDJR Loan Note were made to and personally received by Robert McDermott, not MCDJR.

64.     On or about July 31, 2019, PMCD extended a new loan to Tessemae's in the principal amount of $110,000.00 (the "**2019 PMCD Loan**").  The New PMCD Loan was evidenced by a Promissory Note dated July 31, 2019 executed by Tessemae's for the benefit of PMCD (the "**2019 PMCD Loan Note**").  Tessemae's was required under the 2019 PMCD Loan Note to make monthly payments of interest to PMCD at the rate of 13.5 percent per annum. Although the 2019 PMCD Loan was made in the name of PMCD, the loan proceeds were advanced to Tessemae's by Peter McDermott and all payments that Tessemae's made under the 2019 PMCD Loan Note were made to and personally received by Peter McDermott, not PMCD.

65.     The 2019 MCDJR Loan and the 2019 PMCD Loan were made without Democracy's knowledge or consent, materially increased the amount of the Subordinated McDermott Indebtedness, and constituted a material breach by the Defendants of their obligations under the McDermott Subordination Agreements.

66.     The McDermott Subordinated Lenders extended additional unauthorized loans and credit accommodation to Tessemae's in 2021 and 2022 in further breach of their obligations to Democracy under the McDermott Subordination Agreements.

67.     On April 18, 2021, the Original Robert McDermott Loans and the Original Peter McDermott Loans matured by their terms.  Tessemae's was unable to repay the loans as agreed.  Consequently, Robert McDermott and Peter McDermott, without Democracy's knowledge or consent, caused Tessemae's to execute new Promissory Notes that modified and amended the terms of the Original Robert McDermott Loans and the Original Peter McDermott Loans (collectively, the "**2021 Original Loan Modifications**"). They then began to improperly accept and retain monthly interest payments on the improperly modified loans in violation of their obligations under the McDermott Subordination Agreements.

68.     The Original MCDJR Loan and the Original PMCD Loan also matured by their terms on April 18, 2021.  Tessemae's failed to repay the loans at maturity.  MCDJR and PMCD failed to advise Democracy of Tessemae's default as required under the McDermott Subordination Agreements.  Notwithstanding the maturity of the loans, MCDJR and PMCD continued to receive and accept interest payments on the matured loans in violation of the McDermott Subordination Agreements

69.     In May of 2021, Robert McDermott advanced $500,000.00 to Tessemae's and Peter McDermott advanced $1,000,000.00 to Tessemae's on a temporary basis (collectively, the "**Temporary Advances**").  The Temporary Advances were repaid in full by Tessemae's several days after they were received.   Although short-term, the Temporary Advances constituted Subordinated McDermott Indebtedness under the McDermott Subordination Agreements.  Both the Temporary Advances and the subsequent repayments were made without Democracy's knowledge or consent and violated the McDermott Subordination Agreements.

70.     On June 18, 2021, Robert McDermott made a new loan to Tessemae's in the principal amount of $500,000.00 (the "**2021 Robert McDermott Loan**").  On that same day, Peter

McDermott made a new loan to Tessemae's in the principal amount of $3,000,000.00 (the "**2021 Peter McDermott Loan**"). Both loans were made without Democracy's knowledge or consent, materially increased the amount of the Subordinated McDermott Indebtedness, and constituted a material breach by the Defendants of their obligations under the McDermott Subordination Agreements.

71.    A portion of the proceeds of the 2021 Robert McDermot Loan and the 2021 Peter McDermott Loan were used by Tessemae's to improperly repay loans that two other creditors who had signed subordination agreements with Democracy previously made to Tessemae's. Upon information and belief, both Robert McDermott and Peter McDermott were aware of Tessemae's intention to use the proceeds of the 2021 Robert McDermott Loan and the 2021 Peter McDermott Loan for a purpose that violated Democracy's contractual rights under the subordination agreements executed by the other creditors.

72.    In September of 2022, the Defendants improperly modified and amended the long-matured Original MCDJR Loan and the Original PMCD Loan (collectively, the "**2022 Original Loan Modifications**"). The principal amount of the Original MCDJR Note was increased from $350,000 to $1,804,454.00 and the principal amount of the Original PMCD Note was increased from $350,000 to $1,804,454.00. The 2022 Original Loan Modifications were made without Democracy's knowledge or consent, materially increased the amount of the Subordinated McDermott Indebtedness, and constituted a clear breach by the Defendants of their obligations under the McDermott Subordination Agreements.

73.    In all, between August of 2019 and September of 2022, the Defendants collectively received and improperly retained more than $800,000.00 in prohibited interest payments and other income (collectively, the "**Improper Pre-Bankruptcy Payments**") in connection with

Subordinated McDermott Indebtedness, including the unauthorized new loans and loan modifications.

74.     The Improper Pre-Bankruptcy Payments included interest payments that were not "Permitted Payments" under the McDermott Subordination Agreements, were received and retained by the Defendants at a time when they were in default of their obligations under the McDermott Subordination Agreements, and/or had been notified or had actual knowledge that the Senior Democracy Indebtedness was in default and had not yet been repaid in full.

75.     Despite their fiduciary obligations to Democracy under the McDermott Subordination Agreements, the Defendants failed to hold in trust and remit to Democracy the Improper Pre-Bankruptcy Payments they received from Tessemae's and actively concealed from Democracy the fact they had received and retained the Improper Pre-Bankruptcy payments, in breach of their contractual and fiduciary obligations to Democracy.

**Improper Receipt and Retention of Post-Bankruptcy
Payments On Pre-Petition Subordinated McDermott Indebtedness**

76.     In or about September of 2024, in connection with Tessemae's Approved Bankruptcy Plan, the Defendants collectively received from Tessemae's bankruptcy estate (and improperly retained) the sum of $200,000.00 (the "**McDermott Bankruptcy Distribution**") in partial repayment of monies owed to MCDJR and PMCD in connection with the Original MCDJR Loan and the Original PMCD Loan.

77.     Under a separate agreement between the Defendants and the Vetters entered into in or about July of 2024, the Vetters, as guarantors of the Democracy Loan, agreed to make periodic payments to the Defendants totaling $550,000.00 in the aggregate (collectively, the "**Vetter Settlement Payments**") in settlement of their personal liability to the Defendants on the

Subordinated McDermott Indebtedness.  Upon information and belief, the Defendants have received to date approximately $250,000,00 in Vetter Settlement Payments.

78.    Upon information and belief, the McDermott Bankruptcy Distribution and the Vetter Settlement Payments were paid to and retained personally by Robert McDermott and Peter McDermott, even though the payments were ostensibly being made on indebtedness owed to MCDJR and PMCD.

79.    The McDermott Bankruptcy Distribution and the Vetter Settlement Payments constitute payment of Subordinated McDermott Indebtedness received at a time when the Democracy Loan was in default and unpaid.

80.    Under the terms of the McDermott Subordination Agreements, the Defendants were required to hold McDermott Bankruptcy Distribution and the Vetter Settlement Payments in trust for the benefit of Democracy and to promptly remit the payments to Democracy in the form they were received.

**Improper Receipt and Retention of Payments On Debtor-In-Possession Financing**

81.    In or about February of 2023, in connection with Tessemae's Bankruptcy Case, Robert McDermott and Peter McDermott collectively provided $625,000.00 in debtor-in-possession financing to Tessemae's (the "**DIP Loan**").

82.    Although Robert McDermott and Peter McDermott initially proposed extending the DIP Loan to Tessemae's in the names of their wholly owned entities MCDJR and PMCD, they subsequently incorporated a new special purpose entity, Tesse DIP, LLC ("**Tesse DIP**"), which they designated as the nominal lender on the DIP Loan.

83.    Although the DIP Loan was made in the name of Tessee DIP, all funds used to make the loan were personally provided by Robert McDermott and/or Peter McDermott.

84.    The DIP Loan was secured by a junior lien against all of Tessemae's assets.  The Bankruptcy Court's Order approving the DIP Loan expressly provided that the lien was subordinate to the lien securing the Democracy Loan.

85.    During the Bankruptcy Case, Tessemae's made monthly interest payments totaling approximately $25,000.00 on the DIP Loan.  Upon information and belief, these payments were paid directly to Robert McDermott, not Tessee DIP.

86.    In connection with the Debtor's Approved Bankruptcy Plan, the sum of $650,000.00 was disbursed to Tessee DIP in repayment of the DIP Loan.  Upon information and belief, the $650,000.00 payment, which was disbursed in or about September of 2024, was paid directly to and retained by Robert McDermott, not Tessee DIP.

87.    The $675,000.00 in payments that were made from Tessemae's bankruptcy estate in connection with the DIP Loan (collectively, the "**DIP Loan Payments**") were made using the proceeds of assets of Tessemae's in which Democracy had a senior lien.

88.    The DIP Loan Payments represent payments on obligations owed directly or indirectly to one or more of the Defendants and therefore constitute Subordinated McDermott Indebtedness as defined in the McDermott Subordination Agreements.

89.    Because the DIP Loan Payments were received at a time when the Democracy Loan was in default and unpaid, the Defendants were required under the terms of the McDermott Subordination Agreements to hold the DIP Loan Payments in trust for the benefit of Democracy and to promptly remit the payments to Democracy in the form they were received.

**Democracy Discovers and Demands that the Defendants Surrender the**
**Improper Payments They Received on the Subordinated McDermott Indebtedness.**

90.    In 2024, in conjunction with and following the implementation of the Debtor's Approved Plan, Democracy received information and records from Tessemae's and other parties

from which it discovered for the first time the various improper payments and other breaches by the Defendants of their obligations under the McDermott Subordination Agreements.

91.    By letter dated November 12, 2024, Democracy demanded that the Defendants remit to Democracy all payments they improperly received and retained in connection with the Subordinated McDermott Indebtedness, including the Improper Pre-Bankruptcy Payments, the McDermott Bankruptcy Distribution, the Vetter Settlement Payments and the DIP Loan Payments.

92.    The Defendants have refused to comply with Democracy's demand or to otherwise satisfy their obligations to Democracy under the McDermott Subordination Agreements.

### COUNT I
### (Breach of Contract – Improper Pre-Bankruptcy Payments)

93.    Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

94.    The McDermott Subordination Agreements constitute valid and binding contractual obligation between Democracy and Defendants.

95.    Pursuant to the McDermott Subordination Agreements, the Defendants contractually agreed, among other things, that:

a.    the Subordinated McDermott Indebtedness would be subordinate in all respects to the Senior Democracy Indebtedness;

b.    with the sole exception of Permitted Payments, the Defendants would not accept or retain any payment with respect to the Subordinated McDermott Indebtedness unless and until the Senior Democracy Indebtedness was paid in full; and

c.    if the Defendants received any payment with respect to the Subordinated McDermott Indebtedness that they were not entitled under the McDermott Subordination Agreements to accept or retain, they would hold the payment "in trust" for the benefit of

Democracy and immediately remit the payment to Democracy for application to the Senior Democracy Indebtedness in precisely the same form it was received by the Defendants.

96.    The Defendants materially and intentionally breached the McDermott Subordination Agreements by, among other things,

a.    Accepting and retaining the Improper Pre-Bankruptcy Payments; and

b.    Failing to hold the Improper Pre-Bankruptcy Payments "in trust" for the benefit of Democracy; and

c.    Failing to immediately remit the Improper Pre-Bankruptcy Payments to Democracy in the same form the payments were received by the Defendants for application to the Senior Democracy Indebtedness.

97.    As a direct and proximate result of the Defendants' breach of their contractual obligations to Democracy under the McDermott Subordination Agreements, Democracy has sustained compensable damages in excess of $800,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A.    Requiring that the Defendants account to Democracy for all Improper Pre-Bankruptcy Payments they accepted and retained with respect to Subordinated McDermott Indebtedness;

B.    Imposing a constructive trust upon the Improper Pre-Bankruptcy Payments and any proceeds thereof the Defendants accepted and retained with respect to Subordinated McDermott Indebtedness;

C.    Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.    Granting Democracy such other relief as may be appropriate.

## COUNT II
### (Conversion -- Improper Pre-Bankruptcy Payments)

98.    Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

99.    The McDermott Subordination Agreements provide that any payment received by the Defendants with respect to the Subordinated McDermott Indebtedness that was not permitted under the McDermott Subordination Agreements constitutes specific and identifiable "property" of Democracy that the Defendants were required to hold "in trust" and to remit to Democracy in precisely the same form in which it was received by the Defendants.

100.    The Defendants received the Improper Pre-Bankruptcy Payments and failed to remit the payments to Democracy as required under the McDermott Subordination Agreements.

101.    The Defendants intentionally accepted and retained the Improper Pre-Bankruptcy Payments without permission or justification in violation of the McDermott Subordination Agreements.

102.    The Defendants deliberately failed to remit the Improper Pre-Bankruptcy Payments to Democracy in the form in which they were received in violation of the McDermott Subordination Agreements.

103.    The Defendants wrongfully exercised dominion and control over the Improper Pre-Bankruptcy Payments in violation of the McDermott Subordination Agreements.

104.    Democracy was entitled to actual and immediate possession of the Improper Pre-Bankruptcy Payments.

105.    The Defendants' wrongful retention of the Improper Pre-Bankruptcy Payments constituted a tortious conversion of those payments.

106.    As a direct and proximate result of the Defendants' conversion of Democracy's property, Democracy has sustained compensable damages in excess of $800,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A.    Requiring that the Defendants account to Democracy for all Improper Pre-Bankruptcy Payments they accepted and retained with respect to the Subordinated McDermott Indebtedness;

B.    Imposing a constructive trust upon any proceeds of the Improper Pre-Bankruptcy Payments the Defendants accepted and retained with respect to the Subordinated McDermott Indebtedness;

C.    Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.    Granting Democracy such other relief as may be appropriate.

## COUNT III
### (Breach of Fiduciary Duty-- Improper Pre-Bankruptcy Payments)

107.    Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

108.    Under the McDermott Subordination Agreements, the Defendants were required to hold any payment they received with respect to Subordinated McDermott Indebtedness that they were not permitted under the McDermott Subordination Agreements to accept or retain "in trust" for the benefit of Democracy.

109.    Under the McDermott Subordination Agreements and applicable law, the Defendants acted as trustees with respect to any payment they were required to hold "in trust" for Democracy.

110.    As a trustee with respect to payments they were required to hold "in trust" for Democracy, the Defendants owed Democracy various fiduciary duties, including a duty of loyalty and care.

111.    By entering into the McDermott Subordination Agreements, the Defendants knowingly and intentionally accepted the fiduciary duties imposed upon them in the agreements and under applicable law.

112.    As a fiduciary with respect to the trust funds of Democracy that the Defendants received, McDermott was obligated to, among other things, preserve and protect the trust funds, promptly inform Democracy of its receipt of the trust funds, and promptly remit the trust funds to Democracy in precisely the same form in which they were delivered to the Defendants.

113.    The Defendants breached the fiduciary duties they owed to Democracy under the McDermott Subordination Agreements and applicable law by accepting and retaining for their own use and benefit the Improper Pre-Bankruptcy Payments, failing to hold the payments "in trust" for the benefit of Democracy, failing to promptly inform Democracy of their receipt of the payments, failing to promptly remit the payments to Democracy in the same form in which they

were received as required under the McDermott Subordination Agreements, and actively concealing its actions and omissions from Democracy.

114. As a direct and proximate result of the Defendants' breach of the fiduciary duties they owed to Democracy under the McDermott Subordination Agreements, Democracy has sustained compensable damages in excess of $800,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A.      Requiring that the Defendants account to Democracy for all the Improper Pre-Bankruptcy Payments they accepted and retained with respect to Subordinated McDermott Indebtedness;

B.      Imposing a constructive trust upon any proceeds of the Improper Pre-Bankruptcy Payments the Defendants accepted and retained with respect to Subordinated McDermott Indebtedness;

C.      Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.      Granting Democracy such other relief as may be appropriate.

## COUNT IV
### (Fraudulent Concealment - Improper Pre-Bankruptcy Payments)

115. Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

116. Given the fiduciary obligations imposed upon the Defendants under the McDermott Subordination Agreements and applicable law, the Defendants had a duty to disclose to

Democracy any payment the Defendants received from Tessemae's with respect to Subordinated McDermott Indebtedness that they were not entitled to accept or retain.

117. The Defendants actively and fraudulently concealed from Democracy the Improper Pre-Bankruptcy Payments.

118. The Defendants concealed the Improper Pre-Bankruptcy Payments with the specific intention of misleading and deceiving Democracy.

119. Due to the Defendants' fraudulent concealment of the Improper Pre-Bankruptcy Payments, Democracy was prevented from learning of the payments and was misled and deceived by the Defendants.

120. As a direct and proximate result of the Defendants' fraudulent concealment of the Improper Pre-Bankruptcy Payments, Democracy has sustained compensable damages in excess of $800,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A. Requiring that the Defendants account to Democracy for all the Improper Pre-Bankruptcy Payments they accepted and retained with respect to Subordinated McDermott Indebtedness;

B. Imposing a constructive trust upon any proceeds of the Improper Pre-Bankruptcy Payments the Defendants accepted and retained with respect to Subordinated McDermott Indebtedness;

C. Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.      Granting Democracy such other relief as may be appropriate.

**COUNT V**
**(Breach of Contract – Improper Post-Bankruptcy Payments)**

121.    Democracy incorporates by reference herein all the factual allegations contained in paragraphs 1 through 92 of this Complaint.

122.    The McDermott Subordination Agreements constitute valid and binding contractual obligation between Democracy and Defendants.

123.    Pursuant to the McDermott Subordination Agreements, the Defendants contractually agreed, among other things, that:

a.      the Subordinated McDermott Indebtedness would be subordinate in all respects to the Senior Democracy Indebtedness;

b.      with the sole exception of Permitted Payments, the Defendants would not accept or retain any payment with respect to the Subordinated McDermott Indebtedness unless and until the Senior Democracy Indebtedness was paid in full;

c.      in the event the Defendants received or were entitled to receive any payment or distribution in connection with the liquidation of Tessemae's assets in a bankruptcy or insolvency proceeding, including a payment or distribution related to the Subordinated McDermott Indebtedness, the payment or distribution would be paid or delivered directly to Democracy for application to the Senior Democracy Indebtedness; and

d.      if the Defendants received any payment with respect to the Subordinated McDermott Indebtedness that they were not entitled under the McDermott Subordination Agreements to accept or retain, they would hold the payment "in trust" for the benefit of Democracy and immediately remit the payment to Democracy for application to the Senior Democracy Indebtedness in precisely the same form it was received by the Defendants.

28

124. The Defendants materially and intentionally breached the McDermott Subordination Agreements by, among other things,

    a.    Accepting and retaining the McDermott Bankruptcy Distribution, the Vetter Settlement Payments, and the DIP Loan Payments (collectively, the "**Improper Post-Bankruptcy Payments**"); and

    b.    Failing to hold the Improper Post-Bankruptcy Payments "in trust" for the benefit of Democracy; and

    c.    Failing to immediately remit the Improper Post-Bankruptcy Payments to Democracy in the same form the payments were received by the Defendants for application to the Senior Democracy Indebtedness.

125. As a direct and proximate result of the Defendants' breach of their contractual obligations to Democracy under the McDermott Subordination Agreements, Democracy has sustained compensable damages in excess of $1,200,000.00, exclusive of interest and costs, and has incurred other damages and losses.

WHEREFORE, Democracy prays that this Honorable Court enter judgment in its favor against the Defendants:

A.    Requiring that the Defendants account to Democracy for all Improper Post-Bankruptcy Payments they accepted and retained with respect to Subordinated McDermott Indebtedness;

B.    Imposing a constructive trust upon the Improper Post-Bankruptcy Payments and any proceeds thereof the Defendants accepted and retained with respect to Subordinated McDermott Indebtedness;

C.    Awarding Democracy compensatory damages in an amount in excess of $75,000.00, exclusive of interest and costs, together with pre-judgment interest and the costs of this lawsuit; and

D.    Granting Democracy such other relief as may be appropriate.

/s/ James T. Heidelbach
James T. Heidelbach (CPF No.: 8512010265)
Keith M. Lusby (CPF No. 1312180188)
GEBHARDT & SMITH LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
Telephone: (410) 752-5830
Facsimile: (443) 957-1904
jheid@gebsmith.com
klusby@gebsmith.com

*Attorneys for Plaintiff, Democracy Capital Corporation*

30

## Case Information

C-24-CV-25-003179 | Democracy Capital Corporation vs. Robert McDermott, Jr., et al.

Case Number
C-24-CV-25-003179

Court
Baltimore City Circuit Court

File Date
04/23/2025

Case Type
Contract - Breach

Case Status
Open

## Party

Plaintiff
Democracy Capital Corporation

Active Attorneys ▾
Lead Attorney
Bondurant, Hannah Catharine
Retained

Defendant
McDermott, Jr., Robert

Defendant
MCDJR-Tesse, LLC

Defendant
McDermott, Peter

Defendant
PMCDTesse, LLC

## Events and Hearings

04/23/2025 Complaint / Petition

04/23/2025 Case Information Report Filed

04/23/2025 Request to Issue

04/23/2025 Supporting Exhibit

04/23/2025 Supporting Exhibit

04/23/2025 Supporting Exhibit

04/23/2025 Supporting Exhibit

04/24/2025 Summons Issued ▾

Requested By
Democracy Capital Corporation

Unserved

Unserved

Unserved

Unserved

04/24/2025 Summons Issued (Service Event) - New Case

04/24/2025 Writ /Summons/Pleading - Electronic Service